## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND,
DEPARTMENT OF THE ENVIRONMENT
1800 Washington Boulevard
Baltimore, Maryland 21230,

               Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
COMMERCE and
THE HONORABLE GARY LOCKE IN HIS
CAPACITY AS THE SECRETARY OF
COMMERCE,
14th & Constitution Ave, N.W.
Washington, D.C. 20230,

               Defendants.

Serve On:

    Rod J. Rosenstein
    United States Attorney for the District of
    Maryland
    36 South Charles Street, 4th Floor
    Baltimore, Maryland 21201

    And

    Eric H. Holder, Jr.
    United States Attorney General
    U.S. Department of Justice
    950 Pennsylvania Ave. NW,
    Washington, D.C. 20530-0001

Civil Action No. _____

---

## COMPLAINT

The State of Maryland, Department of the Environment ("MDE" or the "Department"),

by and through its attorneys Douglas F. Gansler, Attorney General of Maryland, and Adam D.

Snyder, Assistant Attorney General, files this Complaint for declaratory relief and review of

administrative action against Defendants the United States Department of Commerce ("Department of Commerce") and the Honorable Gary Locke, in his capacity as the Secretary of the United States Department of Commerce ("Commerce Secretary"), for the following reasons:

**INTRODUCTION**

1.     The Maryland Department of the Environment brings this action to challenge Defendants' determination that the liquefied natural gas ("LNG") project proposed by AES Sparrows Point LNG, LLC and Mid-Atlantic Express, LLC (together "AES") is consistent with the Coastal Zone Management Act, 16 U.S.C. § 1451, *et seq*. ("CZMA"), and to vindicate the State's statutory right to ensure that projects that affect the coastal zone are consistent with the State's Coastal Zone Management Plan ("CZMP").

2.     AES proposes to construct an LNG import terminal in Baltimore, Maryland, and an 88-mile pipeline from the LNG terminal to interconnections with other pipelines in Eagle, Pennsylvania (together the "Project").   The 30-inch diameter pipeline would cross 171 waterways, adversely impact approximately 23 acres of wetlands in Maryland and Pennsylvania, and involve the dredging and disposal of approximately 3.7 million cubic yards of sediment from Baltimore Harbor, much of which has been contaminated due to past industrial activities.

3.     The construction and operation of the Project would have significant environmental impacts and implicate numerous regulatory requirements under several State and federal environmental laws, including the Clean Water Act, 33 U.S.C. § 1251 *et seq*. ("CWA"), the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*. ("NEPA"), the National Historic Preservation Act, 16 U.S.C. §§ 470 *et seq*.("NHPA"), the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*. ("ESA"), and the Magnuson-Stevens Fisheries Conservation and

Management Act, 16 U.S.C. §§ 1801 *et seq.* ("MSA"). The environmental reviews required under these statutes remain ongoing today.

4.     As part of the applications it submitted for the State environmental permits required for the Project, AES certified to MDE that the Project was consistent with Maryland's federally approved CZMP. Under applicable timeframes, MDE was required to agree or object to AES's certification within six months, despite the fact that certain aspects of the Project – most notably the adverse effect on water quality from dredging, the ultimate disposition of the 3.7 million cubic yards of dredged material, and the impacts of an ever-changing pipeline route – remained unclear and under study. Faced with this gap in information, Maryland objected to AES's certification on the grounds that the Project had not yet received all applicable State permits and was, therefore, not consistent with Maryland's CZMP or, in the alternative, that Maryland did not have enough information to determine whether the Project was consistent with its CZMP.

5.     After AES appealed the objection, Defendants overrode MDE's objection and concluded that, despite not having yet obtained any State or federal permits, the Project was consistent with the CZMA. As detailed further below, Defendants' decision to override Maryland's objection was arbitrary and capricious and not supported by substantial evidence.

6.     MDE is adversely affected and aggrieved by the Secretary of Commerce's decision. The decision strips the State of any meaningful role in the administration of the CZMA which, if properly applied, ensures the State's ability to manage its coastal resources consistent with its CZMP. The State brings this action for judicial review of final agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and submits that it is entitled to

review of the Department of Commerce action and to declaratory relief as authorized by 28

U.S.C. §§ 2201 and 2202.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331 and 1346.

8.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1391 and 1402(a)(1).

## PARTIES

9.      Plaintiff Maryland Department of the Environment is a State agency within the

Executive Branch of the State of Maryland.   Md. Code Ann., Envir. § 1-401.   Plaintiff is

entrusted under Maryland law with oversight and enforcement of Maryland's environmental laws,

including those which implicate the State's coastal resources and its CZMP.

10.     Defendant Department of Commerce is a Department of the Executive Branch of

the United States Government.

11.     The Honorable Gary Locke is sued in his official capacity as the Secretary of the

U.S. Department of Commerce.   Although the decision at issue here was rendered by the former

Secretary of Commerce, Carlos M. Gutierrez, the current Secretary of Commerce is responsible for

the administration of the CZMA process and has the power to effectuate the relief MDE seeks

here, namely, rescission of the decision to override Maryland's denial of coastal zone consistency.

## REGULATORY BACKGROUND

12.     In 1972, Congress enacted the CZMA to provide funding for the development and

implementation of state CZMPs, finding that:

> [t]he key to more effective protection and use of the land and water resources of the
> coastal zone is to encourage the states to exercise their full authority over the lands and
> waters in the coastal zone by assisting the states, in cooperation with Federal and local
> governments and other vitally affected interests, in developing land and water use

programs for the coastal zone, including unified policies, criteria, standards, methods, and processes for dealing with land and water use decisions of more than local significance.

16 U.S.C. § 1451(i).

13.    The CZMA states that "it is the national policy (1) to preserve, protect, develop, and where possible, to restore or enhance the resources of the Nation's coastal zone for this and succeeding generations; [and] (2) to encourage and assist the states to exercise effectively their responsibilities in the coastal zone through the development and implementation of management programs to achieve wise use of the land and water resources of the coastal zone, giving full consideration to ecological, cultural, historic, and esthetic values as well as the needs for compatible economic development. . . ." 16 U.S.C. § 1452.

14.    The CZMA and its implementing regulations, 15 C.F.R. § 930, are administered by the Department of Commerce, largely through the agency's National Oceanic and Atmospheric Administration ("NOAA").

15.    Section 307(c)(3) of the CZMA provides that applicants or entities proposing to conduct activities that require a federal license or permit and that will have coastal effects in a state that has a CZMP approved by the Department of Commerce are subject to the requirements of the federal consistency review provisions of the CZMA, 16 U.S.C. § 1456(c)(3)(A) and 15 C.F.R. § 930, subparts A, B, D, and H.

16.    Maryland's CZMP was approved by the Commerce Secretary in August, 1978. Maryland's CZMP is referred to as a "networked" program in that it is based on existing State laws, regulations, and enforceable policies.  As a result, an applicant demonstrates consistency with the CZMP by obtaining all of the applicable permits required by the State laws encompassed within the CZMP.

17.     Project proponents must certify to the federal agency that would issue a permit that the project's activities comply with the host state's approved CZMP and that the activity will be conducted in a manner that is consistent with that CZMP. *See* 16 U.S.C. § 1456(c)(3)(A). The project proponents must furnish to the state or its designated agency a copy of the certification so that the state can either agree with, or object to, the certification that the project and its conduct would comply with the enforceable policies of the state's federally approved CZMP. *Id.*

18.     Once a state has received the proponent's federal certification, it has six months to agree with or object to the certification. *Id.* If a state objects to a project's certification of coastal zone consistency, the federal government cannot issue permits or licenses for the project unless the Secretary of Commerce overrides the state's objection pursuant to an appeal process under the CZMA. *Id.* The Secretary of Commerce may override a state's objection on either of two grounds: the Secretary must find either (a) that the proposed activity is consistent with the objectives of the CZMA or (b) that it is otherwise necessary in the interest of national security. *Id.* Absent one of these findings, the state's objection must be respected.

19.     To determine whether a proposed activity is consistent with the objectives of the CZMA, the Secretary of Commerce must evaluate whether the proposed activity meets each of three elements:

(1)     The activity furthers the national interest as articulated in § 302 or § 303 of the CZMA in a significant or substantial manner;

(2)     The national interest furthered by the activity outweighs the activity's adverse coastal effects, when those effects are considered separately or cumulatively; and

(3)     There is no reasonable alternative available which would permit the activity to be conducted in a manner consistent with the enforceable policies of the management program.

15 C.F.R. § 930.121.

20.     The U.S. Federal Energy Regulatory Commission ("FERC") is the lead federal agency for licensing the construction and operation of natural gas facilities and pipelines. In that role, FERC coordinates applicable authorizations, including those under the Natural Gas Act ("NGA"), 15 U.S.C. § 717 *et seq.*, NEPA, and other statutes. FERC sets schedules for the issuance of federal authorizations for natural gas infrastructure proposals and maintains a consolidated record of all decisions made with respect to federal authorizations. FERC's consolidated record constitutes the basis for the record for appeals to the Department of Commerce under the CZMA consistency provisions. *See* 15 C.F.R. § 930.127.

21.     The U.S. Army Corps of Engineers ("Corps") issues authorizations pursuant to § 404 of the CWA, 33 U.S.C. § 1344, and § 10 of the Rivers & Harbors Act, 33 U.S.C. § 403, to conduct dredging in waters of the United States and to discharge dredged and fill materials into jurisdictional wetlands and waters.

22.     The U.S. Environmental Protection Agency ("EPA") may serve as a cooperating agency for the purposes of reviewing and commenting upon a project's application to the Corps for dredge and fill permits under the CWA and for the preparation of an Environmental Impact Statement ("EIS") for a project's activities pursuant to NEPA.

23.     All of the State permits required for the AES Project that are issued by MDE under the Environment Article of the Annotated Code of Maryland are obtained through an umbrella permitting process established under the Coastal Facilities Review Act, Md. Code Ann., Envir. § 14-505 ("CFRA"). For the AES terminal and pipeline project, the laws applicable include:

>           (a)     Tidal Wetlands Act, Md. Code Ann., Envir. § 16-101 *et seq.*, COMAR
>                   26.24;

(b)     Nontidal Wetlands Protection Act, Md. Code Ann., Envir. § 5-901 *et seq.*, COMAR 26.23;

(c)     Waterway Construction Act, Md. Code Ann., Envir. § 5-501 *et seq.*, COMAR 26.17.04;

(d)     Air Quality Control Act, Md. Code Ann., Envir. § 2-101 *et seq.*, COMAR 26.11;

(e)     Water Appropriation and Use Act, Md. Code Ann., Envir. § 5-501 *et seq.*, COMAR 26.17.01; and

(f)     Water Pollution Control Act, Md. Code Ann., Envir. § 9-301, *et seq.*, COMAR 26.08.02.

24.     Under Maryland's federally-approved CZMP, consistency with the CZMA is demonstrated by a project's compliance with all applicable state laws and permit requirements, including those encompassed within CFRA.

## FACTUAL BACKGROUND

### The Project

25.     AES Sparrows Point LNG, LLC proposes to construct and operate a new LNG terminal on Sparrows Point – a peninsula of land extending out into the Patapsco River, a tidal tributary of the Chesapeake Bay.  The proposed facility would be located on an 80-acre site just 1.1 miles from the heavily populated Turners Station neighborhood, on a site historically co-located and used in connection with the Sparrows Point steel mill.

26.     Mid-Atlantic Express, LLC – like AES Sparrows Point LNG, LLC, a corporate subsidiary of the AES Corporation – proposes to construct an 88-mile pipeline running from the Sparrows Point facility in a northeasterly direction to a terminus in Eagle, Pennsylvania, where the pipeline would connect with three existing interstate pipelines.

27.     Although the full scope of the adverse impacts of the Project is still unclear, the majority of the environmental impacts are caused by three aspects of the Project:  (a) the dredging of the shipping lanes and turning basin to depths necessary to accommodate the especially deep-

draft LNG tankers that would serve the terminal; (b) the ultimate disposition of the dredged material, whether it be by its beneficial re-use, disposal in a landfill, or stockpiling on site; and (c) the routing of the pipeline through wetlands and waterways that serve as habitat for several endangered species and through areas designated as essential fish habitat by the National Marine Fisheries Service ("NMFS").

Dredging of Contaminated Sediments

28.     AES proposes to dredge the waters in front of the Sparrows Point facility to a depth of 45 feet, which is the depth necessary to accommodate the tankers that would offload at the terminal, which have a deeper draft than the ocean-going vessels that traditionally operate in the Baltimore Harbor.

29.     The sediments in Baltimore Harbor have been contaminated historically by industrial use and are impaired by several chemical constituents, including PCBs, chromium, zinc, lead, mercury, nickel, copper, cyanide, and chlordane.  Fish consumption advisories were issued in 1986, and expanded in 2001, for chlordane, PCBs, and dieldrin.

30.     AES's initial sampling results indicate that the sediments in front of the Sparrows Point project site have high concentrations of some of these chemical constituents and have particularly elevated levels of poly aromatic hydrocarbons (PAH) and heavy metals.

31.     AES proposes to dredge approximately 3.7 million cubic yards of sediment in the first two years of construction of the Project and maintenance-dredge another 500,000 cubic yards of sediment every six years.  By comparison, the *total* amount of material dredged from Baltimore Harbor per year is approximately 600,000 cubic yards.

32.     Dredging of this magnitude causes a number of specific adverse impacts to water quality.   The re-suspension of contaminated sediments within the water column depresses

dissolved oxygen, limiting the water's suitability for aquatic life. In addition, dredging to the depths planned by AES will create deep-water areas where levels of dissolved oxygen would be so low as to constitute permanent "dead zones" in which no aquatic organisms can survive.

33.    The proposed dredging has the potential to affect at least three endangered species (*e.g.*, sea turtles, the shortnose sturgeon, sei whales), both through the re-suspension of contaminated sediments and the creation of deep-water "dead zones" within the Harbor.

Disposition of the Dredged Material

34.    AES proposes to de-water the dredged material and process it by adding Portland cement and other additives as a bulking agent to create what it calls "processed dredged material" or "PDM." AES concedes that processing the dredged material in this manner will not remove contaminants, but expects that the addition of Portland cement will bind the contaminants in the material and prevent their future release. AES has not, however, performed any testing on the PDM to determine the extent to which contaminants will leach out of the material under different conditions of exposure.

35.    AES hopes to provide the PDM to a number of end-users for a variety of uses, ranging from use as roadbed material to reclamation of abandoned mine sites. While AES has indicated that it has already discussed the use of the material with potential end-users, it has not provided MDE or other, federal agencies with details as to where and how the material would be used.

36.    In the event that AES in unable to find anyone to accept the PDM for "beneficial use," it plans to truck the material offsite to two landfills in Virginia, one operated by Waste Management and one by Allied Waste Services. However, neither company has contracted for

acceptance of the PDM and both companies have stated that they would accept the material *only if* it met environmental standards.

Pipeline Impacts to Wetlands, Waterways, and Endangered Species

37.     The pipeline AES proposes to construct would cross 171 rivers and streams, adversely impact more than 23 acres of swamps, bogs, and other wetlands regulated by MDE and the Corps, and run through, under, and across the habitat of several endangered species (*e.g.*, Indiana bat, Maryland darter, bog turtle).

38.     Some of these crossings will be accomplished through horizontal directional drilling ("HDD") – the process of drilling a pipeline route beneath the affected waterway and pulling the pipe through – while others will involve the excavation of open trenches.

39.     The final pipeline alignment hinges on a number of considerations, including the CWA requirement to avoid and minimize impacts to wetlands and waterways, avoidance of endangered species habitat, cost, and engineering feasibility.  To date, however, it is still unknown how AES will cross the many wetlands and waterways in its path.

## The CZMA Review Process

The Initial CZMA Review Process

40.     On January 8, 2007, AES Sparrows Point LNG, LLC filed an application with FERC under Section 3(a) of the Natural Gas Act and Parts 153 and 350 of the FERC regulations for authorization to construct and operate the LNG import terminal.  The same day, Mid-Atlantic Express, LLC filed an application with FERC under Section 7(c) of the Natural Gas Act for a certificate of public convenience and necessity to authorize the construction and operation of the 88-mile natural gas pipeline, including the use of the government's power of eminent domain.

41.     On January 9, 2007, AES filed two applications with the Corps for authorizations pursuant to § 404 of the CWA and § 10 of the Rivers & Harbors Act to conduct dredging in waters of the United States and to discharge dredged and fill materials into those waters during the course of the construction of the LNG import terminal and the 88-mile natural gas pipeline. After the Corps rejected separate applications for the terminal and pipeline, AES filed a consolidated application for the entire Project with the Corps in April, 2007.

42.     On January 9, 2007, AES submitted its CFRA application to MDE to obtain the applicable State permits and approvals encompassed within CFRA.   Both Corps applications were included in AES's CFRA application and included a certification that the proposed Project was consistent with Maryland's CZMP.   The submission of that certification to the Department triggered the six-month consistency review period for the Corps permit in accordance with 15 C.F.R. § 930.60.

43.     On April 18, 2007, the Department met with AES to discuss the status of the State's review and requested that AES agree to stay the six-month time clock applicable to MDE's CZMA consistency determination for the Corps permit in order to ensure consideration of a complete record.   AES indicated during the meeting that it expected to agree to staying the six-month timeclock.

44.     On May 7, 2007, the Department wrote AES informing it that "the activities/project descriptions contained within the Resource Reports are numerous[,] vague[,] and not site-specific" and requesting additional information on forty-six separate items, including information regarding dredging, the PDM, and the proposed pipeline construction.   In light of the missing information, the letter advised AES that its "application does not sufficiently address avoidance and

minimization efforts in regard to State regulated resources" and that "[f]urther documentation and discussions will be necessary on this matter."

45. By letters dated May 9, 2007, and June 25, 2007, MDE reminded AES that it had not yet formally responded to the Department's request that AES agree to stay the six-month deadline with respect to the Corps permit. MDE stated in its letter that, unless AES agreed to a stay until such time as the Department was prepared to render its CFRA decision, the Department would have no choice but to object to AES's CZMA certification.

46. On June 29, 2007 – more than two months after a stay was first discussed and only ten days before the conclusion of the six-month review period – AES responded to MDE's May 9 and June 25 letters and informed the Department that it would not agree to stay the six-month timeclock with respect to the Corps permit.

47. On July 3, 2007, the Corps wrote to AES requesting additional information on thirty-eight separate items relating to the environmental impact of the dredge and fill activities associated with the Project. The Corps found AES's sampling of the dredged contaminated sediments to be insufficient, required AES to conduct additional sampling, and requested that AES provide a more specific delineation of the areas and depths proposed for dredging. As MDE had requested, the Corps asked AES for site-specific and detailed information on the design and operation of the proposed dredged material recycling facility and on the handling, storage, and disposal of unprocessed and processed dredged materials. The Corps' letter identified areas of the pipeline plans that remained insufficient, reminded AES that it had to quantify the total permanent and temporary impacts to waters of the United States, and asked AES to "quantify the permanent impacts to wetlands and streams" and "submit a wetland and stream mitigation plan for all

permanent project impacts." The Corps also requested the results of the bog turtle survey that AES's application had indicated would be conducted in the 2007 season.

48.     MDE did the same two days later, informing AES that it was reviewing the information AES had provided and that additional information would be required, particularly with respect to the end use of the processed dredged material and the waterway impacts associated with Project's many stream crossings. The Department alerted AES to the fact that a second detailed information request would be forthcoming.

49.     AES responded to the Department's July 5th letter on the next day, providing some additional information, referring the Department back to the materials it submitted with its applications, and otherwise dismissing the matters encompassed by the Department's data requests as "picayune in nature." In the same letter, AES pressed the Department for a consistency determination by July 9th.

50.     On July 9, 2007, six months after AES's CFRA application and statement of CZMA consistency, the Department objected to AES's certification that the Project was consistent with Maryland's CZMP on two alternative grounds: (1) the project was not consistent with the Maryland CZMP because AES had not obtained the relevant networked permits; and (2) the Department did not have sufficient information to determine whether the project was consistent with, and permittable under, its networked CZMP. Maryland's objection was specifically related to AES's certification with respect to the Corps permit, but given AES's position that the review period began as early as January 9, 2007, for the FERC license as well as the Corps permit, MDE rendered a consistency determination on both the Corps permit and the FERC license.

Continuing Review of the Project During the CZMA Appeal Process

51.    On August 8, 2007, pursuant to Section 307(c)(3)(A) of the CZMA and the implementing regulations, 15 C.F.R. § 930, Subpart H, AES filed a Notice of Appeal with the Department of Commerce, seeking to have the Secretary override MDE's objection to AES's certifications to the Corps and to FERC that the Project was consistent with Maryland's CZMA.

52.    Despite having objected to AES's certification of coastal zone consistency, MDE continued to review the Project as details of it unfolded. On August 1, 2007, the Department met with AES, FERC, the Corps, and EPA to discuss the status of the State and federal reviews of the application(s) and the need for additional sediment sampling. The Department noted in the meeting that a second request for additional information was being prepared, which request was sent to AES on August 15, 2007.

NOAA Requests for Agency Input During the CZMA Appeal Process

53.    In an effort to generate a more complete record, NOAA sent letters to several federal agencies and departments on October 11, 2007, requesting comments on AES's appeal of Maryland's denial of CZMA consistency. NOAA gave the agencies until November 8, 2007 to provide their comments for the record. NOAA sent these request letters to the Corps, FERC, the Department of Defense, the Department of Homeland Security, the National Security Council, the Department of Energy, the Department of State, the Department of Transportation, the Department of Justice, and the Homeland Security Council.

54.    On November 7, 2007, FERC responded to NOAA's October 11 request for comments and stated that FERC was "in the process of conducting an extensive analysis of the project" that "will examine the need for the project, and include an exhaustive study of the project's environmental impacts, alternatives, and safety and security." FERC informed NOAA

that it was "in the early stages of collecting information on the project and had not yet even issued a draft or final environmental impact statement." FERC concluded that, "[t]herefore, at this time we are not in a position to comment on the issues raised by your letter" and noted that the record related to the Project was still being developed for the authorizations.

55.     On February 15, 2008, NOAA issued additional letters to various offices within EPA, the Corps, and the U.S. Department of the Interior's Fish and Wildlife Service ("FWS") requesting comments on AES's appeal within less than thirty days.  In addition to any general comments, the letter specifically requested comment on the dispute between AES and the Department regarding whether the record was sufficient to identify and weigh the adverse coastal effects of the Project with respect to water quality impacts from dredging, impacts from the disposal of the dredged material, and impacts of the pipeline on wetlands, waterbodies, and associated wildlife.

56.     EPA responded on March 13, 2008, clarifying its role of reviewing and commenting upon draft environmental impact statements and Corps applications and indicating that it had been acting as a cooperating agency with regard to the Project.  EPA clarified that it had not yet independently generated any information or analysis or reviewed a draft EIS or Corps application and, therefore, was not in a position to comment on the Project at that time.

57.     The Corps responded on April 2, 2008, stating that it considered AES's permit application incomplete and attaching its July 3, 2007, letter to AES requesting additional information on thirty-eight separate items relating to the environmental impact of the dredge and fill activities and the pipeline.  The Corps pointed out that the EIS would be expected to comprehensively evaluate the environmental effects of the Project, including the issues raised in the NOAA letter, and that it would comment on the EIS when it was available.  The Corps

further noted that it would provide additional comments to AES regarding avoidance or minimization of adverse impacts to aquatic resources once the Corps had the opportunity to complete field reviews of the proposed terminal site and pipeline route within the coming months.

58.     The Secretary of Commerce closed the record for AES's CZMA appeal on April 14, 2008.  At the time, the pipeline alignment had not been finalized, there had been no testing of the proposed processed dredge material, no identified final use for the PDM, no contracts or agreements with landfills regarding disposal of dredged material, and no NEPA document released for review.

### The Commerce CZMA Appeal Decision

59.     On June 26, 2008, then Secretary Gutierrez issued his Decision and Findings overriding the Department's objection to AES's federal consistency certification for the Project. Secretary Gutierrez found that AES had satisfied the first of the CZMA's two grounds for overriding a state's objection, concluding that the Project proposed by AES was consistent with the objectives of the CZMA.  In concluding that the national interest purportedly furthered by the Project outweighed its adverse coastal effects, the Secretary relied on a number of faulty, vague, and unsupported findings, including:

60.     Without citation to any record evidence regarding how the U.S. Coast Guard water suitability report relates to the Chesapeake Bay ecosystem or any information from AES explaining how it would address the concerns of the Coast Guard regarding use of the Bay for LNG tanker traffic, the Commerce Secretary found that there was "no evidence in the record" that "adverse coastal effects of the Project on the Chesapeake Bay ecosystem" would be significant or broad, based on his finding that (a) the Coast Guard Waterway Suitability Report

concluded that, with certain safety and security measures, the Bay "can be made suitable" for LNG ship traffic, (b) Maryland did not challenge AES's data on this issue, and (c) other federal agencies had "no negative comments."

61.    Without citing the duration of the dredging and the quantity of dredged material, the Secretary determined that the record established that the adverse impacts on water quality from the re-suspension of contaminated sediments during dredging "will be temporary, limited in scope, and mitigated with environmentally sensitive dredging techniques," including the use of silt curtains and an "environmental" closed clamshell bucket, and that "[g]iven the overlap in dredging area for the BWI project and the Project, it *seems likely* that Maryland's water quality standards also *would not be* violated by the Project" (emphasis added).

62.    With respect to the adverse coastal effect of dredging to depths greater than 30 feet, Commerce determined that the record established that such effects would not be significant, based in part on his findings that although benthic organisms may be "subject to mortality," they would re-colonize the dredged area and "full recovery *could occur* within months," mitigation measures such as silt curtains and an "environmental" dredge would be used, and recolonization of fish and aquatic vegetation "*should occur* within months" (emphasis added). Without citation to the record evidence that, in addition to the 1,200-foot radius of ongoing impact, 117 acres of Harbor bottom would be permanently impacted, the Secretary found the impacts "localized to 1,200 feet from the dredging activity."

63.    With respect to the Project's impact on endangered species, Commerce concluded that the record was "adequate to identify the adverse coastal effects of the Project" on three endangered species – the bog turtle, the shortnose sturgeon, and the sea turtle – and "there is no evidence in the record that [such effects] will be significant."

64.     With respect to the PDM and its ultimate disposition, Commerce concluded that
the record established that the adverse coastal effects of disposal of the PDM "*should not be*
*significant*" (emphasis added) because AES had committed to ensuring that the "leachability" of
the PDM would not exceed applicable regulatory criteria and AES's "chemical testing data"
show that the PDM would be "environmentally acceptable for any of the end-uses proposed by
AES."   In the event that a market for any such end uses did not materialize, Commerce
concluded that AES had provided letters from two landfills indicating that they "can
accommodate" dredged material from the Project.

65.     With respect to the impacts associated with the pipeline, Commerce concluded
that, although only 81% of the pipeline route had been field-surveyed, the record established that
the adverse coastal effects of the Project would be "minimized and mitigated" by AES's
commitment to use construction techniques such as horizontal directional drilling for the
crossings over the Susquehanna and Back Rivers, which were classified as "major" under FERC
guidelines.

66.     With respect to each finding described in paragraphs 61 through 65 above, the
Secretary of Commerce relied upon his findings that the federal agencies had provided "no
negative comments," that Maryland had not challenged the accuracy of AES's application data
and analyses, and that the record was "adequate" and scientifically reliable to support the
findings.

67.     In his Decision, the Secretary of Commerce did not address the Project's impact
on historical or cultural resources or make any findings or conclusions about such impacts.

68.     In the Decision, the Secretary of Commerce indicated that, because FERC did not release the draft EIS for the Project until eleven days after the appeal record had closed, he did not consider the draft EIS in rendering his decision.

### Post-Record Environmental Analysis

69.     On April 25, 2008 – just eleven days after the close of the CZMA appeal record – FERC issued the draft EIS for the proposed Project, which formally initiated the interagency consultation processes required by the ESA and other federal environmental statutes.

70.     On April 30, 2008, the FWS responded late to NOAA's February 15, 2008, request with extensive comments regarding its concern about the possibility that the pipeline would be installed through wetlands and waterways that constitute habitat for bog turtles, a threatened species. The FWS's inability to conclude that the project would not adversely impact the bog turtle was based, in part, on the fact that AES had not conducted site-specific evaluations for bog turtle wetlands.

71.     On June 16, 2008, NOAA provided comments to FERC on the draft EIS, observing that dredging to depths of greater than 20-40 feet creates hypoxic/anoxic areas where dissolved oxygen is depleted and concluding that "we anticipate that areas dredged by this action will cumulatively add to the summer anoxic/hypoxic zone of the river." NOAA also observed that, while the disposal of the PDM within landfills was discussed "briefly" in the draft EIS, the back-up disposal plan must provide greater detail, particularly "regarding long term availability of, and transport to, each [landfill] site."

72.     Also on June 16, 2008, the Corps submitted its comments on the draft EIS, expressing its concern that, among other things, "although recycling/innovative reuse of the dredge material is proposed, no specific end users have been identified," and specifying that the

"final EIS must include appropriate documentation showing that the landfill has the capacity and will, in fact, accept the approximate[ly] 3.7 million cubic yards of dredged material." With respect to the potential for leaching of chemical contaminants from the PDM, the Corps stated that the "final EIS should include an EPA analysis concerning the acceptability of reuse/recycling of the dredged material and disposal in a landfill and the proposed testing of the PDM to ensure the material is suitable for the final uses and/or disposal location(s)."

73.    On June 18, 2008, EPA provided its comments to FERC on the draft EIS, stating that "EPA is concerned that the DEIS does not contain sufficient information to fully assess the potential environmental impacts of the proposed action." EPA noted that more information was "needed to fully assess the environmental impact of this project." EPA raised its ongoing concern about the lack of information on water quality impacts from the dredging and on the treatment and disposal of the dredged material.

74.    FWS provided comments on the draft EIS on August 12, 2008, and indicated that, even with the implementation of best management practices identified in the proposed bog turtle management plan, the Project "may not avoid direct or indirect adverse effects to bog turtles when they are present in a wetland that will be affected by pipeline construction." Consequently, FWS indicated that it "cannot concur that implementation of the proposed bog turtle management plan supports a 'not likely to adversely affect' determination" under the ESA. The FWS also alerted FERC to a "significant change in available information" regarding the distribution of the endangered Indiana bat (*Myotis sodalis*) and the fact that this new information meant that the animal's potential presence in the area of the Project "is now of increased concern."

75.     On December 5, 2008, FERC released the final EIS ("FEIS") for the Project – a more than 2,000-page document purporting to describe the various environmental impacts of the Project.

76.     Maryland and several federal agencies, including the Corps, FWS, NOAA, and the Advisory Council on Historic Preservation ("ACHP"), have provided comments to FERC on the FEIS and have described the many ways in which the FEIS still does not completely and accurately describe the environmental impacts of the Project, including issues that have been raised by MDE and other agencies from the outset related to dredging and the disposal of the dredged materials, water quality, endangered species, and avoidance and minimization of wetland impacts.

77.     On January 6, 2009, the FWS informed FERC by letter that despite the FEIS, it has "determined that there are unanswered questions related to federally listed, endangered and threatened species that may be affected by this Project." The FWS urged FERC not to issue a certification for the Project until such time as formal consultation under § 7 of the ESA had been concluded.

78.     The Corps also submitted its comments on the FEIS on January 6, 2009, focusing on the ongoing endangered species consultation process, the impacts associated with the pipeline, and the ultimate disposition of the PDM.  With respect to endangered species, the Corps noted – as had the FWS – that it was "not comfortable stating that the project is in compliance with the [ESA, NHPA, and MSA] until consultation is deemed complete by both the Corps and the U.S. Fish & Wildlife Service, the National Marine Fisheries Service and the Maryland and Pennsylvania Historic Preservation Offices."  The impacts associated with the pipeline were similarly uncertain inasmuch as the FEIS did not include "complete evaluations and plans" for

HDD crossings of several waterways. Finally, the Corps noted that "[i]f a commercial market does not develop for the [PDM], the final dredge disposal location becomes uncertain and we are not aware of an agreement and plans for a specific location for the alternative disposal plan."

79.   Maryland, through the Power Plant Research Program within its Department of Natural Resources, submitted comments on the FEIS dated January 13, 2009, echoing many of the comments raised by the federal agencies and stating specifically that there still were no data concerning the potential for acidic conditions to develop within the PDM and leach out and no acknowledgement that, due to the creation of additional hypoxic/anoxic areas, "this project would result in the permanent loss of the area being dredged as a viable component of the ecosystem." Maryland emphasized that the creation of these additional hypoxic/anoxic areas "would be an impediment on the State's plans (i.e., TMDL [total maximum daily loads]) to restore water quality in the Baltimore Harbor and Patapsco River." While Maryland noted that it had "not had sufficient time to review the impacts of the newly recommended pipeline variations in the FEIS," it observed that the LNG Terminal and transmission pipeline, individually and together, have a potentially significant impact on historic resources in the area, including the Captain John Smith National Historic Water Trail, the newly-designated (in 2008) Star-Spangled Banner National Historic Trail, and the view corridor between Fort McHenry National Monument and Historic Shrine, the Patapsco River, and the Chesapeake Bay, "where the extraordinary events which inspired our nation's anthem took place."

80.   The ACHP indicated in its January 15, 2009, comments that "there are above-ground properties within the [area of potential effects] that may be eligible for inclusion on the National Register of Historic Places" and that FERC had not responded to the State Historic Preservation Officer's "request that studies focused on above-ground resources, including

historic structure, buildings, objects, historic districts, and landscapes, be conducted and submitted for review in accordance with 36 CFR Section 800.4 of the ACHP's regulations."

81.     Even the Department of Commerce itself – which had earlier determined that the record on appeal was sufficient to render a CZMA decision – submitted comments dated January 12, 2009, identifying deficiencies within the FEIS and concluding that AES had not fully evaluated alternatives to the Project that would reduce dredging and the potential for additional hypoxic/anoxic areas that dredging would cause.  NOAA also indicated that its earlier request for a "detailed back-up disposal plan for contaminated dredge material" had not been met and that the long term availability of landfill sites must be more clearly defined, both for the initial dredging and for the periodic maintenance dredging the Project would require.  Finally, with respect to pipeline impacts, NOAA continue to recommend the use of HDD, emphasizing that its "opposition to use of open-cut pipeline installation for the Deer Creek and Big Gunpowder Falls crossings has been clearly stated since early initiation of review on this proposal."

## Outstanding Environmental Issues

82.     The Project is a massive and complex undertaking and, despite more than two years of regulatory review and repeated agency requests for information, AES has still not been able to describe the environmental impact of several key components of the Project, including unprecedented amounts of dredging of contaminated sediments, the ultimate disposition of the PDM, and the Project's effect on endangered species and essential fish habitat.

83.     Maryland and other reviewing agencies have repeatedly requested that AES and/or FERC provide information about specific mitigation measures that would ameliorate or offset the impact of dredging on water quality – due both to the re-suspension of contaminated sediments and

the creation of "dead zones" within Baltimore Harbor – but, to date, has received no such information in response.

84.     Maryland and other reviewing agencies have repeatedly requested that AES and/or FERC provide information about the leaching potential of the PDM and specific, enforceable mechanisms for the ultimate disposition of the PDM but, to date, has not received anything but AES's commitment to process and dispose of the PDM in compliance with all applicable State and federal environmental requirements.  As the Corps put it in additional comments dated February 6, 2009, AES still has not provided "formal documentation between AES and the owner(s) of the disposal site(s) (e.g. landfill) which clearly states that the owner(s) of the disposal site(s) will accept the contaminated dredge material."

85.     While AES has provided cross-sections of these stream crossings and has estimated the total wetland and waterway impacts associated with the construction of the pipeline, it still has not identified the precise extent of the impacts or provided evaluation and plans for crossing sensitive waterways via the environmentally-preferred HDD construction method.  This is due in part to the fact that critical coordination and consultation is still ongoing with regard to the ESA, MSA, and the NHPA.  With that coordination still incomplete, the Corps informed FERC on February 6, 2009, that "[t]his project, as currently proposed, will likely jeopardize the continued existence or result in the destruction or adverse modification of habitat of Federally listed, endangered and threatened species."

86.     Pursuant to FERC regulations issued under the Natural Gas Act, the Corps' permit decision was originally due on March 5, 2009, but AES requested by letter dated February 13, 2009, that the Corps seek an extension of the FERC-imposed deadline to allow for the development of more information concerning seven separate issues, including the ultimate

disposition of the PDM. The Corps did so and FERC granted an extension to April 6, 2009. The additional time proved insufficient to develop an adequate record for the Corps' permit decision and so, by letter dated March 25, 2009, the Corps formally notified AES that its application is "hereby withdrawn from active status and will be held in abeyance pending resolution of [the outstanding] issues. . . ."

87.    The continuing review of the Project by Maryland and federal agencies has yielded conclusions that directly contradict those reached by the Secretary of Commerce in the CZMA appeal. Whereas the Secretary determined that the record in that proceeding was "adequate" to evaluate the Project's impact on water quality, endangered species, wetlands, and waterways, the other federal agencies have concluded that – even with the preparation of the FEIS – the record still was not sufficient to evaluate the adverse effects of the Project on Maryland's coastal resources. Whereas the Secretary concluded that "there is no evidence in the record that [the adverse coastal effects of the Project on endangered and threatened species] will be significant," the Corps and other federal agencies have warned that, with the additional information provided in the FEIS, "[t]his project, as currently proposed, will likely jeopardize the continued existence or result in the destruction or adverse modification of habitat of Federally listed, endangered and threatened species." Finally, the Secretary failed to mention the Project's impact on historical resources – resources expressly covered by §§ 302 and 303 of the CZMA – even though the ACHP had indicated that such resources are present in Project's area of potential effects and consultation under § 106 of the NHPA is on-going.

88.    The Secretary's Decision, by relying on an incomplete record, and through its numerous deficiencies, errors, and lack of deference to the State's and other federal agencies' opinions and processes, effectively nullifies the statutory requirement that a project be consistent

with the State's CZMP, renders meaningless the State's lawful objection to an applicant's federal consistency certification based on insufficient information, deprives the State of a federally-provided mechanism for exercising its rights and responsibilities under the CZMA, and abdicates responsibility for the protection of the State's coastal zone to future studies and review processes conducted by the state and other agencies.

**COUNT I**
**ADMINISTRATIVE PROCEDURE ACT**

89.     MDE repeats and re-alleges each allegation of the foregoing paragraphs as if fully set forth herein.

90.     The Commerce Decision constitutes final agency action pursuant to 15 C.F.R. § 930.130(c).   Plaintiff has no further right of review or appeal before the Department of Commerce.   Plaintiff has no other remedy available within the Department of Commerce or before the Secretary of Commerce.

91.     Pursuant to this Court's authority under the Administrative Procedure Act to review final agency action that has adversely affected or aggrieved Plaintiff, this Court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in excess of statutory jurisdiction, authority or limitations, or short of statutory right, or without observance of procedure required by law.

92.     The Commerce Decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in excess of statutory jurisdiction, authority or limitations, or short of statutory right, or without observance of procedure required by law for, but not limited to, the following reasons:

(a)     The Secretary erred in basing the Decision and Findings on an incomplete and flawed record that consisted almost exclusively of application materials prepared and submitted by AES, that was filled with unenforceable environmental promises from AES, that failed to consider the import of other agencies' need for information, and that was so premature in development that it did not include the DEIS, FEIS, or the many comments submitted by other federal agencies indicating the many ways in which even the FEIS, as of today, does not adequately describe the full environmental impact of the AES project;

(b)     The Secretary erred in failing to accord deference to the State's and federal agencies' processes and demands to AES for information sufficient to conduct thorough and probing analyses of the impacts as delineated by all key stakeholders;

(c)     The Secretary, without citation to the record or authority, erred in finding that AES's application materials provided reliable scientific conclusions based on the appearance to the Secretary that the materials had a level of "scientific rigor" that the decision failed to cite, define, or measure and that was drawn from a record so underdeveloped that it lacked an unbiased scientific review by any agency with expertise in the subject matter;

(d)     The Secretary erred in finding the Project's application information "complete and scientifically reliable as those terms are applied in CZMA appeals" because the scientific and environmental record in prior CZMA appeals on projects of similar significance reflects detailed comments and information from interested

agencies and detailed analyses of conflicting opinions on the scientific and environmental issues that were reflected in the record;

(e)    The Secretary erred in finding that the adverse impacts to water quality from dredging to depths of greater than 30 feet would not be significant and would be temporary and limited in scope for reasons that include:

   (i)    although benthic organisms may be "subject to mortality," they would re-colonize the dredged area and "full recovery *could occur* within months," even though, at depths of greater than 30 feet, dissolved oxygen reaches levels at which no aquatic life can survive;

   (ii)    that impacts would be "localized to 1,200 feet from the dredging activity" even though the record indicates that, in addition to the 1,200-foot radius of ongoing impact, 117 acres of Harbor bottom would be permanently impacted;

(f)    The Secretary erred in finding that the adverse impacts to water quality from the re-suspension of contaminated sediments during dredging would not be significant and would be temporary and limited in scope, and mitigated for reasons that include:

   (i)    the Secretary ignored and/or failed to cite the record evidence regarding quantity and duration of the impact, where in addition to the 120-acre harbor bottom footprint plus a 1,200-foot radius, the Project would involve dredging with unprecedented quantities and depths (3.7 million cubic yards of contaminated dredged sediments) over a two-year period, with maintenance dredging every six years beyond that;

(ii)    the Secretary found relevant that AES would use a closed ("environmental") clamshell bucket dredge and silt curtains during dredging, when AES, in fact, has indicated it only intends to use an environmental dredge for a portion of the dredging and has not made silt curtains a part of its dredge plan;

(iii)    the Secretary made a qualified finding, and then relied upon that finding, unsupported by sufficient analysis or support in the record, that "[g]iven the overlap in dredging area for [a prior] project and the Project, it seems likely that Maryland's water quality standards also would not be violated by the Project;"

(iv)    the Secretary misinterpreted or inaccurately cited the record evidence, and then relied upon that error, in finding that the federal agencies contacted by NOAA for comment had "no negative comments" regarding the dredging when, in fact, the agencies had indicated that their reviews of the Project were at stages too premature to fully comment;

(v)    the Secretary misinterpreted the record evidence, and then relied upon that error, in finding that Maryland did not challenge the accuracy of AES's data and analyses regarding the dredging, when, in fact, throughout the pendency of the appeal, Plaintiff and other agencies continued to seek more specific technical information from AES in order to conduct assessments of the validity of, and potential impacts from, AES's proposal.

(g)   The Secretary erred in rendering any findings and conclusions about the adverse coastal impacts from disposal of the PDM for reasons that include:

  (i)   the Secretary made a qualified finding that the "adverse coastal effects of disposal should not be significant" and then relied upon that finding in reaching the conclusions he reached in the Decision;

  (ii)   the record contained only various possibilities and proposals for disposal of the PDM and did not include specific data or information (1) quantifying the potential for the leaching of chemical contaminants from the PDM; (2) identifying specifically where and how AES will use the PDM; and (3) concerning contracts or other binding agreements ensuring that the PDM will be disposed of properly;

  (iii)   the Secretary misinterpreted or inaccurately cited the record evidence, and then relied upon that error, in finding that the federal agencies contacted by NOAA for comment had "no negative comments" regarding the PDM, when, in fact, the agencies had indicated that their work on the Project were at stages too premature to fully comment;

  (iv)   the Secretary misinterpreted the record evidence, and then relied upon that error, in finding that Maryland did not challenge the accuracy of AES's data and analyses regarding the PDM, when, in fact, throughout the pendency of the appeal, Plaintiff and other agencies continued to seek more specific technical information from AES in order to conduct assessments of the validity of and potential impacts from AES's proposal.

(h)     The Secretary erred in finding that the adverse impacts to wetlands and waterbodies from pipeline crossings would not be significant for reasons that include:

   (i)     the record reflected that the pipeline alignment and methods of crossing key waterbodies were not even finalized, much less fully reviewed or analyzed at the time of the Secretary's findings;

   (ii)     the Secretary, without any independent analysis, adopted as its findings AES's conclusions that impacts from pipeline construction would be minor and short-term;

   (iii)     the Secretary, without analysis or citation to authority, equated AES's promises to use standard environmental mitigation techniques with a finding that adverse coastal effects thus would not be significant;

   (iv)     the Secretary misinterpreted or inaccurately cited the record evidence, and then relied upon that error, in finding that the federal agencies contacted by NOAA for comment had "no negative comments" regarding impacts from the pipeline, when, in fact, the agencies had indicated that their work on the Project were at stages too premature to fully comment.

   (v)     the Secretary misinterpreted the record evidence, and then relied upon that error, in finding that Maryland did not challenge the accuracy of AES's data and analyses regarding impacts from the pipeline, when, in fact, throughout the pendency of the appeal, Plaintiff and other agencies continued to seek more specific technical information from AES in order

to conduct assessments of the validity of and potential impacts from AES's proposal.

(i)     The Secretary erred in basing his conclusion under the CZMA that the national interest furthered by the Project outweighs the Project's adverse coastal effects on the Coast Guard Waterway Suitability Report, when that Report concluded that "the Chesapeake Bay is not currently suitable" for the LNG tanker traffic associated with the Project, and when AES had not yet entered into binding, enforceable commitments to provide the "additional safety measures necessary to responsibly manage the maritime safety and security risks" and render the Chesapeake Bay suitable for such traffic; and

(j)     The Secretary erred in concluding under the CZMA that the national interest furthered by the Project outweighs the Project's adverse coastal effects without even considering the Project's impact on historic and cultural resources; and

(k)     The Secretary erred in even undertaking to conduct the balancing test required by the CZMA to weigh the national interest furthered by the Project against the Project's adverse coastal effects when the lack of evidence, qualified findings, misinterpretations of the record, and inaccurate evidence in the record did not support even conducting a balancing test, and as a result, the Secretary erred in his decision on the outcome of that balancing test.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Maryland Department of the Environment respectfully requests this Court:

A.      Find that it has jurisdiction to consider this matter;

33

B.      Render a declaratory judgment that the Secretary of Commerce's override of Plaintiff's objection violated the APA and the CZMA;

C.      Render a declaratory judgment that the Secretary's Decision and Findings were arbitrary, capricious, and abuse of discretion, and contrary to law;

D.      Set aside the Secretary's Decision and Findings and remand to the Secretary with instructions to affirm Plaintiff's objection;

E.      Alternatively, set aside the Secretary's Decision and Findings and remand to the Secretary to conduct further proceedings as instructed by the Court; and

F.      Order such other relief as the Court may deem just and proper.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

ADAM D. SNYDER
Assistant Attorney General
Federal Bar No. 27523
Maryland Department of the Environment
1800 Washington Blvd. Ste. 6048
Baltimore, MD 21230
Phone 410-537-3034
Fax 410-537-3053
E-mail: asnyder@oag.state.md.us

Attorneys for the Maryland Department
of the Environment

34