UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND,
DEPARTMENT OF THE ENVIRONMENT

v.

U.S. DEPARTMENT OF COMMERCE *et al.*

Civil No. RDB 09-1208

**MARYLAND DEPARTMENT OF THE ENVIRONMENT'S
MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

DOUGLAS F. GANSLER
Attorney General of Maryland

ADAM D. SNYDER
Assistant Attorney General
Federal Bar No. 27523
Office of the Attorney General
Maryland Department of the Environment
1800 Washington Boulevard
Baltimore, Maryland 21230
(410) 537-3034

January 22, 2010

**TABLE OF CONTENTS**

Page

FACTUAL AND REGULATORY BACKGROUND ................................................................2

    The Coastal Zone Management Act ................................................................2

    The AES Project ................................................................4

    Dredging of Contaminated Sediments ................................................................4

    Disposition of the Dredged Material................................................................6

    Pipeline Impacts to Wetlands, Waterways, and Endangered Species ................................6

    The Federal Consistency Process for the Project................................................................8

    Continuing Review of the Project During the CZMA Appeal Process ............................10

    The Commerce CZMA Appeal Decision ................................................................13

    Subsequent Developments................................................................14

ARGUMENT................................................................16

I.    The Commerce Decision is Arbitrary and Capricious Because it Relies on Findings About the Environmental Impact of the Project that Were Rendered Prior to Completion of the Interagency Coordinated Review of the Project and that are Contradicted by the Fourth Circuit's Decision in *AES v. Wilson*, Commerce's Own Subsequent Conclusions, and the Record Itself................................16

    A.    Commerce's Conclusion that "It Seems Likely" that the Dredging of Contaminated Sediments Adjacent to the Terminal Site Would Not Violate Maryland Water Quality Standards is Arbitrary and Capricious and is Not Supported by the Record. ................................................................18

        1.    The Dredging of Additional Anoxic/Hypoxic Areas at Depths Below Thirty Feet Violates Maryland Water Quality Standards. ................18

        2.    Commerce's Conclusion that the Re-Suspension of Contaminated Sediments During Dredging Would Not Have a Significant Adverse Coastal Effect is Not Supported by the Record. ................................21

B.      Commerce's Conclusion that the Use of the PDM in Road Construction, Mine Reclamation, and Other Manners "Should Not" Have a Significant Coastal Effect is Arbitrary and Capricious When AES Has Not Identified Specific End Uses for the PDM or Provided Any Data Concerning the Leachability of the PDM. .......................................................................................23

C.      Commerce's Conclusion that the Adverse Coastal Effects of the Proposed Pipeline Crossings of Deer Creek and 171 Other Waterways Would Be Outweighed by the Project's Benefits is Arbitrary and Capricious When the Final Pipeline Route Was Not Known at the Time of the Decision and When the Comments of Commerce's Own Sub-Agency Contradict that Conclusion. ...............................................................................................................26

D.      Commerce's Conclusion that Impacts to Endangered Species Will Not be Significant is Arbitrary and Capricious When the Federal Agencies With Jurisdiction Over Endangered Species Have Not Completed Their Reviews and AES Had Not Even Completed its Species Surveys. .........................................30

II.     Commerce's Reliance on an Incomplete Record to Determine that the Adverse Coastal Effects of the Project Would Be Outweighed by its Benefits is Arbitrary and Capricious and Violates the Terms and Intent of the CZMA. .......................................32

A.      Commerce Violates the APA By Basing its Override Decision on a Record That Lacks Substantial Evidence Demonstrating that the Project Will Not Violate Water Quality Standards, the Endangered Species Act, and Other Federal Statutory Mandates......................................................................................33

B.      Commerce Violates the CZMA By Leaving to Other Agencies its Responsibility to Ascertain the Adverse Coastal Effects of the Project and By Failing to Provide State and Federal Agencies a "Reasonable Opportunity for Detailed Comments."...................................................................35

C.      The Commerce Decision Deprives the State of its Primary Responsibility for Reviewing Projects in the Coastal Zone. ...................................................38

CONCLUSION.................................................................................................................43

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND, DEPARTMENT OF THE ENVIRONMENT | |
| v. | Civil No. RDB 09-1208 |
| U.S. DEPARTMENT OF COMMERCE *et al.* | |

## MARYLAND DEPARTMENT OF THE ENVIRONMENT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

This case seeks review of the decision of the U.S. Department of Commerce to override the Maryland Department of the Environment's ("MDE," "Maryland," or "the State") denial of coastal zone consistency under the Coastal Zone Management Act, 16 U.S.C. § 1451, *et seq.* ("CZMA"), on the grounds that the liquefied natural gas project proposed by AES Sparrows Point LNG, LLC and Mid-Atlantic Express, LLC (together "AES"), is consistent with the policies of the CZMA. The Department of Commerce's decision must be reversed and remanded because the statutorily-required balancing of adverse environmental impacts against national interests it purports to carry out is not supported by the record – a record closed before essential information about the project was available and without affording State and federal environmental agencies a reasonable opportunity to comment. By overriding the State's denial and approving the project on the basis of an incomplete record, the Department of Commerce effectively writes the State out of the CZMA process, depriving it, without justification, of its central role under the Act.

Summary judgment is appropriate here because the facts surrounding the Project are compiled in the administrative record and have already been incorporated into two published decisions of the Fourth

Circuit. *See AES Sparrows Point LNG, LLC v. Smith*, 527 F.3d 120 (4th Cir. 2008) (holding Baltimore

County land use requirements preempted by the Natural Gas Act); *AES Sparrows Point v. Wilson*, —

F.3d —, 2009 WL 4981233 (4th Cir., Dec. 22, 2009) (affirming the MDE's denial of a water quality

certification under § 401 of the federal Clean Water Act).  As other courts have noted, "judicial review

of agency action is often accomplished by filing cross-motions for summary judgment." *State of

Connecticut v. U.S. Dept. of Commerce,* 2007 WL 2349894, *1 (D.Conn. 2007).  For the reasons set

forth below, MDE is entitled to judgment as a matter of law.

## FACTUAL AND REGULATORY BACKGROUND

### The Coastal Zone Management Act

As the Fourth Circuit recently summarized in *AES Sparrows Point LNG, LLC v. Smith*, 527 F.3d

120, 123 (2008), the CZMA was designed "to encourage states to develop land-use planning programs

that will preserve, protect, and restore the environment of their coastal zones."  *Shanty Town Assocs.

Ltd. P'ship v. EPA,* 843 F.2d 782, 793 (4th Cir.1988). To that end, the CZMA authorizes states to create

coastal zone management plans ("CMPs") setting forth the state's "objectives, policies, and standards to

guide public and private uses of lands and waters in the coastal zone." 16 U.S.C. § 1453(12). Although

the states' participation is voluntary, the statute provides two key incentives for the states to adopt and

enforce a CMP.  First, once a state's CMP is approved by the National Oceanic and Atmospheric

Administration ("NOAA"), the state is eligible to receive federal grants for the purpose of administering

its coastal zone management programs. 16 U.S.C. § 1455.  Maryland's CMP was approved in

September, 1978.[1]

---

[1]  Answer and Affirmative Defenses to Complaint, filed by Defendants U.S. Department of
Commerce and Gary Locke, Secretary of Commerce on October 14, 2009, ¶16 (hereinafter "Commerce
Answer"). Maryland's program is known as a "networked" program, meaning that it is comprised of all
of the various permits required under State law to perform a particular activity within the coastal zone.

The focus of this litigation, however, is on the second incentive the CZMA provides for state participation, namely, the federal consistency requirement, which permits states with approved CMPs to review federally permitted projects and "conditionally veto" those that are not consistent with the enforceable policies of the state's approved CMP. *AES v. Smith*, 527 F.3d at 123. Specifically, the consistency provision requires applicants to provide to the state a certification that the project under federal consideration is "consistent" with the state's approved CMP and provides that "[n]o license or permit shall be granted by the Federal agency until the state or its designated agency has concurred with the applicant's certification." 16 U.S.C. § 1456(c)(3)(A). The state's federal consistency role has been described as "'a kind of reverse preemption provision that assures a state that, with certain exceptions, federal agency activities or federally-sponsored activities affecting the coastal zone will be consistent with the state-created and federally approved coastal management plan.'" *Connecticut*, 2007 WL 2349894, *3 (quoting Joseph J. Kalo, *et al.*, *Coastal and Ocean Law* 3d, at 192 (2007)).

Project proponents who are aggrieved by a state's consistency decision are not without recourse; they may appeal to the Secretary of Commerce who, after "providing a reasonable opportunity for detailed comments from the Federal agency involved and from the state," 16 U.S.C. § 1456(c)(3)(A), may override the state's objection if he concludes that "the activity is consistent with the objectives of this title or is otherwise necessary in the interest of national security." *Id.* To determine whether the project is "consistent with the objectives" of the CZMA, the Secretary must find, among other things, that "the national interest furthered by the activity outweighs the activity's adverse coastal effects, when those effects are considered separately or cumulatively." 15 C.F.R. § 930.121(b); *see generally Cal. Coastal Comm'n v. Granite Rock Co.,* 480 U.S. 572, 590-91 (1987) (explaining consistency review).

---

A project proponent demonstrates consistency with a networked program by obtaining all of the applicable State permits. (A.R. 3323.)

The AES Project

AES Sparrows Point LNG, LLC proposes to construct and operate a new LNG terminal on Sparrows Point – a peninsula of land extending out into the Patapsco River, a tidal tributary of the Chesapeake Bay. The proposed facility would be located on an 80-acre site historically co-located and used in connection with the Sparrows Point steel mill. Commerce Answer ¶25. The terminal would be located just 1.1 miles from the heavily populated Turners Station neighborhood. Administrative Record ("A.R.") at 1899.[2]

Mid-Atlantic Express, LLC – like AES Sparrows Point LNG, LLC, a corporate subsidiary of the AES Corporation – proposes to construct an 88-mile pipeline running from the Sparrows Point facility in a northeasterly direction to a terminus in Eagle, Pennsylvania, where the pipeline would connect with three existing interstate pipelines. Commerce Answer ¶26. The pipeline would cross 171 rivers and streams, Commerce Answer ¶37, and affect approximately 19 acres of wetlands. (A.R. 5738.)

As the Fourth Circuit recently concluded in *AES Sparrows Point v. Wilson*, the pipeline and the terminal (together, "the Project") "involves three different aspects": (a) the dredging of the shipping lanes and turning basin; (b) the ultimate disposition of the dredged material; and (c) the routing of the pipeline. *Wilson*, 2009 WL 4981233, *3; *see also* Commerce Answer ¶27. Each aspect "raises different environmental concerns." *Wilson*, 2009 WL 4981233, *3.

Dredging of Contaminated Sediments

"First, in order to accommodate the LNG tankers, the Project requires dredging an approximately 118-acre turning basin and approach channel within Baltimore Harbor to forty-five feet of depth." *Id.* at *3. This is the depth necessary to accommodate the tankers that would offload at the terminal, which have

---

[2]   Although the administrative record in this proceeding is paginated with the notation "NOAA Doc" preceding the page number, all citations to the administrative record herein will omit the notation "NOAA Doc" and take the simpler form of "A.R." to avoid unnecessary repetition.

a deeper draft than the ocean-going vessels that traditionally operate in the Baltimore Harbor.  Commerce Answer ¶28.

Like much of Baltimore Harbor, the waters and sediments around Sparrows Point are contaminated by past industrial use and are impaired by several chemical constituents, including PCBs, chromium, zinc, lead, mercury, nickel, copper, cyanide, and chlordane and fail to meet Maryland water quality standards.  *See Wilson*, 2009 WL 4981233, *3; Commerce Answer ¶29; *see also* A.R. 393, 398, 1658.  Fish consumption advisories were issued in 1986, and expanded in 2001, for chlordane, PCBs, and dieldrin.  Commerce Answer ¶29; A.R. 1658.  AES's sampling results indicate that the sediments in front of the Sparrows Point project site contain some of these chemical constituents and have elevated levels of poly aromatic hydrocarbons and heavy metals.  Commerce Answer ¶30; A.R. 394, 421, 1657.

AES proposes to dredge approximately 3.7 million cubic yards of sediment in the first two years of construction of the Project and maintenance-dredge another 500,000 cubic yards of sediment every six years.  Commerce Answer ¶31; *see also Wilson*, 2009 WL 4981233, *3; A.R. 4655, 4686.  Dredging of this magnitude causes a number of specific adverse impacts to water quality.  The re-suspension of contaminated sediments within the water column depresses dissolved oxygen, limiting the water's suitability for aquatic life.  *See* Commerce Answer ¶32; A.R. 4684-85; *see also Connecticut*, 2007 WL 2349894, at *9-10.  Dredging to the depths planned by AES will also create deep-water channel areas where levels of dissolved oxygen "would drop below Maryland water quality standards, rendering aquatic life virtually impossible."  *Wilson*, 2009 WL 4981233, *3; *see also* A.R. 416, 4687-88, 5130, 5216-17, 5255.  These impacts have the potential to affect various species of sea turtles and/or shortnose sturgeon, Commerce Answer ¶33, both through the re-suspension of contaminated sediments and the creation of deep-water anoxic/hypoxic areas within the Harbor.  (A.R. 4687-89, 5430.)

Disposition of the Dredged Material

The second aspect of the Project is the terminal itself, which would include facilities to re-gasify the LNG for transportation by pipeline and process the approximately 3.7 million cubic yards of contaminated material dredged from the harbor. *Wilson*, 2009 WL 4981233, *3. The processing of the dredged material involves both the de-watering of the dredged spoil and the mixing of the de-watered sediments with Portland cement and other additives in an effort to bind the contaminants within what AES calls "processed dredged material" or "PDM." *Id.* at *3-4. "Depending on the success of that process in preventing the leaching of historical contaminants, AES hopes to make the PDM available as fill material for mine reclamation projects, construction fill, and other development projects, with placement in land fills as a secondary option." *Id.* at *4. While AES has indicated that it has already discussed the use of the material with potential end-users, it has not provided MDE or other, federal agencies with details as to where and how the material would be used. Commerce Answer ¶ 35; A.R. 4568, 4706, 5404.

AES acknowledges that processing the dredged material in this manner will not remove contaminants, but expects that the addition of Portland cement will bind the contaminants in the material and prevent their future release. (A.R. 4644.) AES has not, however, performed any testing on the PDM to determine the extent to which contaminants will leach out of the material under different conditions of exposure. (A.R. 421, 4513, 4677.) Instead, AES proposes to demonstrate the suitability of the PDM for beneficial use *after* the Project is up and running and "prior to shipment to the proposed beneficial use/upland disposal site(s) if required by the end use." (A.R. 4644.)

Pipeline Impacts to Wetlands, Waterways, and Endangered Species

The final aspect of the project is the installation of a 30-inch diameter natural gas pipeline approximately 88 miles from Baltimore Harbor to Eagle, Pennsylvania, where the pipeline would

connect with three existing interstate pipelines. *Wilson*, 2009 WL 4981233, *4. The pipeline AES proposes to construct would cross 171 rivers and streams, Commerce Answer ¶37, including waters such as Deer Creek, which qualifies as a State Scenic and Wild River and a Tier II water – Maryland's highest water quality classification. *See* Md. Code Ann., Nat. Res. § 8-402(a)(2); Code of Md. Regs. ("COMAR") 26.08.02.04-1O. The pipeline will adversely impact approximately 19 acres of swamps, bogs, and other wetlands regulated by MDE and the U.S. Army Corps of Engineers ("Corps") (A.R. 5738.), and run through, under, across, and adjacent to the habitat of several endangered species (*e.g.*, bog turtle). (A.R. 1562-63, 1740); *see* Commerce Answer ¶37 (conceding that the pipeline "will be adjacent to several endangered species habitat").

The principal environmental issue presented by the proposed pipeline is how AES plans to cross the many wetlands and waterways in its path. AES proposes two types of crossing techniques: open-cut trenching and horizontal directional drilling or "HDD." Commerce Answer ¶38, A.R. 388-91. Open-cut trenching is the traditional crossing method for utility lines and, as its name suggests, involves the excavation and backfilling of a trench through the stream bottom. (A.R. 200-02, 388-89.) Even if the stream is diverted during the construction process, the open-cut method involves the potential for significant habitat disruption and downstream sedimentation. *See* A.R. 412. HDD is an alternative crossing method that involves drilling a pipeline route beneath the affected wetland or waterway and pulling the pipe through the borehole. (A.R. 388-90, 1433-36.) By drilling beneath the wetlands and waterways, HDD avoids the habitat disruption and sedimentation caused by traditional open-cut trenching. *See, e.g.*, A.R. 388 (AES Resource Report concluding that HDD "provides the maximum protection to surface water bodies"); *see also* A.R. 412, 1431. The final pipeline alignment hinges on a number of considerations, including the requirement to avoid and minimize impacts to wetlands and waterways, avoidance of endangered species habitat, cost, and engineering feasibility. Commerce Answer ¶39.

The Federal Consistency Process for the Project

The federal consistency process began on January 9, 2007, when AES submitted its application to MDE to obtain the applicable State permits and approvals encompassed within the Maryland Coastal Facilities Review Act. Md. Code Ann., Envir. § 14-501–511 ("CFRA"). Commerce Answer ¶42. AES included within its CFRA application two separate applications it had filed with the Corps seeking authorizations pursuant to § 404 of the Clean Water Act, 33 U.S.C. § 1344, and § 10 of the Rivers & Harbors Act, 33 U.S.C. § 403, to conduct dredging in waters of the United States and to discharge dredged and fill materials into those waters during the course of the construction of the terminal and pipeline. Commerce Answer ¶¶41,42. Included within the Corps applications was a certification that the proposed Project was consistent with Maryland's CMP. The submission of that certification to MDE triggered the six-month consistency review period for the Corps permit in accordance with 15 C.F.R. § 930.60. Commerce Answer ¶42.

On April 18, 2007, MDE met with AES to discuss the status of the State's review and requested that AES agree to stay the six-month time clock applicable to MDE's federal consistency determination for the Corps permit in order to ensure consideration of a complete record. On May 7, 2007, MDE wrote AES informing it that "the activities/project descriptions contained within the Resource Reports are numerous[,] vague[,] and not site-specific" and requesting additional information on forty-six separate items, including information regarding dredging, the PDM, and the proposed pipeline construction. (A.R. 4527.) In light of the missing information, MDE advised AES that its "application does not sufficiently address avoidance and minimization efforts in regard to State regulated resources" and that "[f]urther documentation and discussions will be necessary on this matter." (A.R. 4530.)

By letters dated May 9, 2007, and June 25, 2007, MDE reminded AES that it had not yet formally responded to MDE's request that AES agree to stay the six-month deadline with respect to the Corps

8

permit. (A.R. 4539, 4542.) MDE stated in its June letter that, unless AES agreed to a stay until such time

as MDE was prepared to render its CFRA decision, it would have no choice but to object to AES's CZMA

certification. (A.R. 4543.) On June 29, 2007 – more than two months after a stay was first discussed and

only ten days before the conclusion of the six-month review period – AES responded to MDE's May 9 and

June 25 letters and informed MDE that it would not agree to stay the six-month timeclock with respect to

the Corps permit. (A.R. 4544.)

Meanwhile, MDE was not the only agency informing AES that its application was incomplete. On

July 3, 2007, the Corps wrote to AES requesting additional information on thirty-eight separate items

relating to the environmental impact of the dredge and fill activities associated with the Project. (A.R.

4549.) The Corps found AES's sampling of the dredged contaminated sediments to be insufficient,

required AES to conduct additional sampling, and requested that AES provide a more specific delineation

of the areas and depths proposed for dredging. (A.R. 4549-4554.) As MDE had requested, the Corps

asked AES for site-specific and detailed information on the design and operation of the proposed dredged

material recycling facility and on the handling, storage, and disposal of unprocessed and processed

dredged materials. (A.R. 4552.) The Corps' letter identified areas of the pipeline plans that remained

insufficient, reminded AES that it had to quantify the total permanent and temporary impacts to waters of

the United States, and asked AES to "quantify the permanent impacts to wetlands and streams" and

"submit a wetland and stream mitigation plan for all permanent project impacts." (A.R. 4553.) The Corps

also requested the results of the bog turtle survey that AES's application had indicated would be conducted

in the 2007 season. (A.R. 4554.)

MDE did the same two days later, informing AES that it was reviewing the information AES had

provided and that additional information would be required, particularly with respect to the end use of the

processed dredged material and the waterway impacts associated with Project's many stream crossings.

9

(A.R. 4555.)   MDE alerted AES to the fact that a second detailed information request would be forthcoming. (A.R. 4556.) AES responded to MDE's July 5th letter on the next day, providing some additional information, referring back to the materials it submitted with its applications, and otherwise dismissing the matters encompassed by MDE's data requests as "picayune in nature." (A.R. 4559.) In the same letter, AES pressed MDE for a consistency determination by the July 9 deadline. *Id.*

On July 9, 2007, six months after AES's CFRA application and statement of CZMA consistency, MDE objected to AES's certification that the Project was consistent with Maryland's CMP on two alternative grounds: (1) the project was not consistent with the Maryland CMP because AES had not obtained the relevant networked permits; and (2) MDE did not have sufficient information to determine whether the project was consistent with, and permittable under, its networked CMP. (A.R. 4560.) Maryland's objection was specifically related to AES's certification with respect to the Corps permit, but given AES's position that the review period began as early as January 9, 2007, for the Federal Energy Regulatory Commission ("FERC") license as well as the Corps permit, MDE rendered a consistency determination on both the Corps permit and the FERC license. (A.R. 4561.) On August 8, 2007, pursuant to Section 307(c)(3)(A) of the CZMA and the implementing regulations, 15 C.F.R. § 930, Subpart H, AES filed a Notice of Appeal with the Department of Commerce, seeking to have the Secretary override MDE's objection to AES's certifications to the Corps and to FERC that the Project was consistent with Maryland's CMP. Commerce Answer ¶51.

Continuing Review of the Project During the CZMA Appeal Process

Despite having objected to AES's certification of coastal zone consistency, MDE continued to review the Project as details of it unfolded. Commerce Answer ¶52. On August 1, 2007, MDE met with AES, FERC, the Corps, and U.S. Environmental Protection Agency ("EPA") to discuss the status of the State and federal reviews of the applications and the need for additional sediment sampling. MDE noted

10

in the meeting that a second request for additional information was being prepared, which request was sent to AES on August 15, 2007. (A.R. 4566.) This and other requests sought additional information about impacts to water quality, end uses of the PDM, and the many proposed pipeline crossings. *Id.*

Meanwhile, the federal agencies also continued their review of the AES proposal and, on October 11, 2007, NOAA sent letters to the Corps, FERC, the Department of Defense, and a number of other federal agencies requesting their comments on AES's appeal of Maryland's denial of CZMA consistency. (A.R. 4597-4616.) However, NOAA gave the agencies until only November 8, 2007, to provide their comments for the record. *See e.g.*, A.R. 4598.

Several of the federal agencies responded that they were in the early stages of their review of the project and were not in a position to comment within the 28-day timeframe imposed by NOAA. For example, FERC responded that it was "in the process of conducting an extensive analysis of the project" that "will examine the need for the project, and include an exhaustive study of the project's environmental impacts, alternatives, and safety and security." (A.R. 4848.) FERC informed NOAA that it was "in the early stages of collecting information on the project and had not yet even issued a draft or final environmental impact statement." *Id.* FERC concluded that, "[t]herefore, at this time we are not in a position to comment on the issues raised by your letter," *id.*, and noted that the record related to the Project was still being developed for the authorizations. (A.R. 4849.)

Despite having informed FERC and several other federal agencies that their comments were due on November 8, 2007, NOAA issued additional letters to various offices within EPA, the Corps, and the U.S. Department of the Interior's Fish and Wildlife Service ("FWS") on February 15, 2008, requesting comments on AES's appeal (A.R. 5661-5668), again giving the contacted agencies less than thirty days to respond. *See, e.g.,* A.R. 5662. In addition to any general comments, the letter specifically requested comment on the dispute between AES and MDE regarding whether the record was sufficient to identify

11

and weigh the adverse coastal effects of the Project with respect to water quality impacts from dredging, impacts from the disposal of the dredged material, and impacts of the pipeline on wetlands, waterbodies, and associated wildlife. *See, e.g.*, A.R. 5667-68.

EPA responded on March 13, 2008, clarifying its role of reviewing and commenting upon draft environmental impact statements and Corps applications and indicating that it had been acting as a cooperating agency with regard to the Project. (A.R. 5677.) EPA stated that it "anticipates reviewing a draft [Environmental Impact Statement] and CWA Section 404 permit application for the AES Sparrows Point LNG Project in the future, but has not yet done so, and is therefore not in a position to provide comment on the project at this time." (A.R. 5677.)

The Corps responded on April 2, 2008, stating that it considered AES's permit application incomplete and attaching its July 3, 2007, letter to AES requesting additional information on thirty-eight separate items relating to the environmental impact of the dredge and fill activities and the pipeline. (A.R. 5691.) The Corps pointed out that "[t]he EIS should comprehensively evaluate the environmental [e]ffects of the proposal, including those issues raised in your letter" and that it would "comment on the adequacy of the EIS once it is released." *Id.* The Corps further noted that it would provide additional comments to AES regarding avoidance or minimization of adverse impacts to aquatic resources once the Corps had the opportunity to complete field reviews of the proposed terminal site and pipeline route within the coming months. *Id.*

The Secretary of Commerce closed the record for AES's CZMA appeal on April 14, 2008. At the time, the pipeline alignment had not been finalized, no contracts or agreements had been entered into with landfills regarding disposal of dredged material, and neither a draft nor final Environmental Impact Statement had been released for review. Commerce Answer ¶58. Nor had AES provided the results of any leachate testing of the PDM or identified the final use for the PDM. (A.R. 191-97, 4513, 4677.) On

April 25, 2008 – just eleven days after the close of the CZMA appeal record – FERC issued the draft

EIS for the proposed Project, which formally initiated the interagency consultation processes required by

the Endangered Species Act and other federal environmental statutes.

The Commerce CZMA Appeal Decision

On June 26, 2008, then Secretary Gutierrez issued his Decision and Findings by the U.S.

Secretary of Commerce in the Consistency Appeal of AES Sparrows Point LNG, LLC and Mid-Atlantic

Express, L.L.C. From an Objection by the State of Maryland (June 26, 2008) ("Commerce Decision").

(A.R. 5710.)  At the time of the Decision, "the final pipeline alignment ha[d] not been finalized,"

Commerce Answer ¶39, discussions were ongoing as to a number of waterway crossings, including that of

Deer Creek (A.R. 5740), and statutorily mandated consultations about the Project's impact on endangered

species remained incomplete.  (A.R. 5742-43.)  Even though a draft EIS had been completed and

published, Secretary Gutierrez indicated that he did not consider it in rendering his decision because

FERC did not release it until eleven days after the appeal record had closed.  (A.R. 5730.)

Despite the outstanding information, Secretary Gutierrez found that AES had satisfied the first of

the CZMA's two grounds for overriding a state's objection, concluding that the Project was consistent

with the objectives of the CZMA.  *See generally* A.R. 5712 *et seq.*  In concluding that the national

interest purportedly furthered by the Project outweighed its adverse coastal effects, the Secretary made a

number of findings, including the following most relevant to this proceeding:

- the adverse impacts on water quality from the re-suspension of contaminated sediments during dredging "will be temporary, limited in scope, and mitigated with environmentally sensitive dredging techniques," including the use of silt curtains and an "environmental" closed clamshell bucket, and that "[g]iven the overlap in dredging area for the BWI project and the Project, it *seems likely* that Maryland's water quality standards also *would not be* violated by the Project" (A.R. 5734)(emphasis added);

- the adverse effect of dredging to depths greater than 30 feet would not be significant, based in part on the finding that, although benthic organisms may be "subject to mortality," they would re-colonize the dredged area and "full recovery *could occur*

13

within months," mitigation measures such as silt curtains and an "environmental" dredge would be used, and recolonization of fish and aquatic vegetation "*should occur* within months" (A.R. 5744-45)(emphasis added);

- the record was "adequate to identify the adverse coastal effects of the Project" on three endangered species – the bog turtle, the shortnose sturgeon, and the sea turtle – and "there is no evidence in the record that [such effects] will be significant" (A.R. 5743);

- the record established that the adverse coastal effects of disposal of the PDM "*should not be* significant" (emphasis added) because AES had committed to ensuring that the "leachability" of the PDM would not exceed applicable regulatory criteria and AES's "chemical testing data" show that the PDM would be "environmentally acceptable for any of the end-uses proposed by AES" (A.R. 5737-38)(emphasis added); and

- although only 81% of the pipeline route had been field-surveyed, the record established that the adverse coastal effects of the Project would be "minimized and mitigated" by AES's commitment to use construction techniques such as horizontal directional drilling for the crossings over the Susquehanna and Back Rivers (A.R. 5741).

With respect to all of these findings, the Secretary of Commerce relied repeatedly upon his understanding that the federal agencies had "no negative comments," that Maryland had not challenged the accuracy of AES's application data and analyses, and that the record was "adequate" and scientifically reliable to support the findings. *See, e.g.,* A.R. 5734, 5737-38, 5741.

Subsequent Developments

Agency review of the Project did not end with the Commerce Decision; federal and State agencies alike prepared and submitted numerous comments on the adequacy of the draft and final EIS and the Corps and MDE continued to review the project for permitting under the Clean Water Act and applicable State laws. On April 25, 2008, the Corps announced the availability of the draft EIS, the commencement of the public notice and comment process on AES's permit application under § 404 of the Clean Water Act, and the initiation of the Maryland's one-year water quality certification review period under § 401. *Wilson,* 2009 WL 4981233, *6; 73 Fed. Reg. 24276, 24277 (May 2, 2008). On February 6, 2009,

14

the Corps informed AES that, due to outstanding information about the ultimate disposal of the PDM, the final pipeline alignment and crossing methodologies, and the Project's impact on endangered species, the Corps was not in a position to finalize its review. The Corps also stated "that based on information currently in the administrative record, it would be difficult for the project to receive a favorable determination from the Corps if the decision needs to be made within the designated Federal agency decision timeframe of 90 days from release of the FEIS (*i.e.*, by March 5, 2009).

*Wilson*, 2009 WL 4981233, *7. "Faced with the prospect of a permit denial, AES requested that the Corps . . . suspend its processing of its § 404 permit application so that AES could provide the outstanding information." *Id.* at *8. Rather than suspend its processing, the Corps considered AES's application "withdrawn from active status and will be held in abeyance pending resolution of these [outstanding] issues and your written request to have the Corps resume evaluation of this permit application." *Id.* (internal quotations omitted).

Meanwhile, MDE on April 24, 2009, denied AES a water quality certification under CWA § 401 citing "four independent and alternative grounds for the denial":

(1) AES had not demonstrated that the PDM will ultimately be managed to ensure compliance with water quality standards . . .; (2) the Project would create additional deep water areas where dissolved oxygen levels would fail to meet Maryland water quality standards; (3) AES had not provided final surveyed plans for all wetland and stream crossings; and (4) until interagency consultations under § 7 of the Endangered Species Act of 1973, 16 U.S.C. § 1536, have been completed, Maryland could not conclude that the Project is consistent with Maryland water quality standards.

*Id.* (internal quotations and citations omitted). AES appealed MDE's decision to the Fourth Circuit which, on December 23, 2009, upheld the MDE decision on two separate grounds. A majority of the panel upheld MDE's denial on the grounds that "the dredging required to accommodate the LNG tankers would create additional deep water areas where dissolved oxygen levels would fail to meet Maryland water quality standards." *Id.* at *15. The concurring opinion of Judge Davis would have

15

upheld the MDE denial on the grounds that AES had not provided final plans for many of the proposed stream crossings and that AES's insistence on crossing Deer Creek via open-cut trench instead of HDD had unacceptable adverse impacts on water quality. *Id.* at *25.

## ARGUMENT

I.  **The Commerce Decision is Arbitrary and Capricious Because it Relies on Findings About the Environmental Impact of the Project that Were Rendered Prior to Completion of the Interagency Coordinated Review of the Project and that are Contradicted by the Fourth Circuit's Decision in *AES v. Wilson*, Commerce's Own Subsequent Conclusions, and the Record Itself.**

The Secretary of Commerce may override a state's objection on either of two grounds:  the Secretary must find either (a) that the proposed activity is consistent with the objectives of the CZMA or (b) that it is otherwise necessary in the interest of national security. 16 U.S.C. § 1456(c)(3)(A). Absent one of these findings, the state's objection must be sustained.[3] To determine whether a proposed activity is consistent with the objectives of the CZMA, the Secretary of Commerce must evaluate whether the proposed activity meets each of three elements:

(1)  The activity furthers the national interest as articulated in § 302 or § 303 of the CZMA in a significant or substantial manner;

(2)  The national interest furthered by the activity outweighs the activity's adverse coastal effects, when those effects are considered separately or cumulatively; and

(3)  There is no reasonable alternative available which would permit the activity to be conducted in a manner consistent with the enforceable policies of the management program.

15 C.F.R. § 930.121.  In this case, Commerce concluded that the Project was consistent with the objectives of the CZMA. *See generally* A.R. 5712 *et seq.*

---

[3]   The Secretary of Commerce based his Decision solely on factor (a) and did not determine whether the Project is "otherwise necessary in the interest of national security." A.R. 5752, n.248.  The Department of Defense, however, stated that it is "not aware of any national defense or other national security interest that would be significantly impaired if the project is not permitted to go forward as proposed." (A.R. 4850.)

Commerce's Decision is subject to review under the traditional arbitrary and capricious standard for review of federal agency decisions under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A). "'[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The entire case on review is a question of law.' *American Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083-84 (D.C.Cir.2001) (citation omitted). Judicial review of agency action is often accomplished by filing cross-motions for summary judgment. The question whether an agency's decision is arbitrary and capricious, however, is a legal issue, whether it is presented as a motion to dismiss or for summary judgment. *Id.*" *Connecticut,* 2007 WL 2349894, *1.

As the Fourth Circuit recently discussed in *Ohio Valley Environmental Coalition v. Aracoma Coal Co.,* "[r]eview under this standard is highly deferential, with a presumption in favor of finding the agency action valid." 556 F.3d 177, 192 (4th Cir. 2009); *see also Natural Res. Def. Council, Inc. v. EPA,* 16 F.3d 1395, 1400 (4th Cir. 1993). "While the standard of review is narrow, the court must nonetheless engage in a 'searching and careful' inquiry of the record . . . 'to educate the court' so that it can 'understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; the choices open to the agency and those made.'" *Ohio Valley,* 556 F.3d at 192-93 (quoting *Ethyl Corp. v. EPA,* 541 F.2d 1, 36 (D.C.Cir. 1976). The arbitrary and capricious standard "is not meant to reduce judicial review to a 'rubber-stamp' of agency action." *Id.* at 192. Deference is due only "where the agency has examined the relevant data and provided an explanation of its decision that includes a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).

A.    **Commerce's Conclusion that "It Seems Likely" that the Dredging of Contaminated Sediments Adjacent to the Terminal Site Would Not Violate Maryland Water Quality Standards is Arbitrary and Capricious and is Not Supported by the Record.**

1.    **The Dredging of Additional Anoxic/Hypoxic Areas at Depths Below Thirty Feet Violates Maryland Water Quality Standards.**

In order to accommodate the particularly deep draft LNG tankers, the Project requires dredging an approximately 118-acre turning basin and approach channel within Baltimore Harbor to forty-five feet of depth. *Wilson*, 2009 WL 4981233, at *3; Commerce Answer ¶28. The dredging will take place within waters of the Patapsco River designated as Use II waters, *see* COMAR 26.08.02.08K(2)(b), and to which a seasonally variable dissolved oxygen ("DO") water quality standard applies, with certain surface waters required to meet a DO standard of 6 mg/l, *see* COMAR 26.08.02.03-3C(8)(b)(i), and so-called "deep channel refuges" subject to a 1 mg/l instantaneous DO standard during the summer months. *See* COMAR 26.08.02.03-3C(8)(f)(1).

Deep channel refuges are those portions of the harbor lying between the submerged bottom and the lower boundary of the "pycnocline" – the transitional density layer of water that forms during the summer months and separates the deeper, cooler, more saline waters from the less saline, warmer, surface waters. *Wilson*, 2009 WL 4981233, *22; COMAR 26.08.01.01B(72-1); A.R. 416, 4687-88. The formation of the pycnocline acts as a barrier to the ability of bottom waters to mix with the upper layers, with the result that water below the pycnocline experiences DO levels at or near zero mg/l. *Wilson*, 2009 WL 4981233, *22-23; A.R. 4687-88. In its Resource Reports, AES observed that sampling results "indicated that dissolved oxygen, particularly at depths lower in the water column, was frequently recorded at levels low enough to inhibit biological productivity (e.g., approximately 2.0 mg/L) during the June effort, with a substantial increase to over 5.0 mg/L during the October effort." (A.R. 1658).

> Historic DO data (1992–1997) show that anoxic conditions (at or near 0 mg/l) have existed in the past within bottom layers of the mouth, inner harbor, and channel of Baltimore Harbor during the summer months

18

> (Maryland Department of the Environment, 2004). Data entered into modeling scenarios projected that non-attainment of DO requirements occur 77% of the time for the period of June 1 through September 30 within the deep channel areas of the Patapsco River mesohaline region, primarily because of hydrological modifications authorized by the Federal Rivers and Harbors Act and a complex tidal circulation that results in the transfer of hypoxic and anoxic waters from the main channels of the bay into the Patapsco River.

(A.R. 4688.) When DO levels reach zero, no aquatic life can survive. (A.R. 416.) While the formation of the pycnocline varies by season, temperature, salinity, and a host of other factors, existing data indicate that, within Baltimore Harbor, this phenomenon generally occurs at approximately 30 feet of depth. *Wilson*, 2009 WL 4981233, *22-23.

This does not mean that there are no living creatures below 30 feet of depth, but it does mean that the AES project, by dredging to 45 feet, will increase the areas within Baltimore Harbor that will turn hypoxic/anoxic during the summer months – a condition that will increase an already existing violation of the applicable water quality standard for dissolved oxygen. As a result, the Project is expected to cause "some degree of mortality" of crabs and other bottom feeders, we well as "suffocation to fish species in the Project area." A.R. 1699; *see also* A.R. 1533.

While Commerce acknowledges that benthic organisms may be "subject to mortality" (A.R. 5744), its conclusion that they would re-colonize the dredged area and that "full recovery *could* occur within months," *id.*, is speculative and is directly contradicted by the Fourth Circuit's decision in *AES v. Wilson* and even its own sub-agency's statements. NOAA – which is an arm of the Department of Commerce – has itself identified the problem with deep-dredging, anoxia/hypoxia, and its impact on aquatic life. As the Fourth Circuit points out, NOAA echoed Maryland's concerns, "recounting data showing that anoxic/hypoxic conditions form in [the] area to be dredged under the Project anywhere between 20 and 40 feet [of depth] during the summer months." *Wilson*, 2009 WL 4981233, *22. NOAA agreed with MDE that "past sampling results of the area indicate that the deeper channel would probably

experience periods of low dissolved oxygen or even hypoxic periods during the summer months." *Id.* Thus, while it may be true that some recolonization of fish and aquatic vegetation could occur in the dredged area during the cooler months, the creation of additional hypoxic areas within Baltimore Harbor directly contradicts Commerce's guess that "it seems likely" that the Project would not violate water quality standards.

In fact, the Fourth Circuit has already upheld MDE's conclusion to the contrary. "After carefully reviewing the record" and recounting NOAA's comments, *Wilson*, 2009 WL 4981233, *21-22, the Fourth Circuit upheld MDE's denial of a water quality certification "based upon the anticipated negative effect on water quality caused by the forty-five foot depth of the proposed deep channel dredging." *Id.* at *21. "By increasing the areas that will not meet dissolved oxygen standards, AES's proposal to dredge new channels to forty-five feet of depth run contrary to the objective and intent of the Baltimore Harbor TMDL Report," which "recognizes the overall objective to increase areas in Baltimore Harbor that will meet dissolved oxygen standards." *Id.* at *22-23. That decision controls here.

Even if NOAA's analysis and the Fourth Circuit decision in *Wilson* were not enough, the type of speculation about recovery times that Commerce indulges in was specifically rejected by the U.S. District Court for the District of Connecticut in *State of Connecticut v. U.S. Dept. of Commerce*, the most recent and analogous CZMA appeal case:

> The Secretary also determined that "recovery of anchor scars *could* occur within a year, or could take several years.". . . The use of the word "could" implies that the anchor scars might recover, but then again, they might not recover for some significant period of time. The Secretary has said nothing definitive about the duration of the adverse coastal effects caused by anchor scars. As a result, his broader conclusion that the adverse coastal effects would be limited in duration is not supported by the record; there is no reasoned connection between the conclusion that the adverse effects on shellfish and water quality will be temporary in duration and that therefore, those adverse effects are outweighed by the national interest.

2007 WL 2349894, *12 (D.Conn. 2007) (emphasis in original).  The Commerce Decision here fails by the same standard.

2.      **Commerce's Conclusion that the Re-Suspension of Contaminated Sediments During Dredging Would Not Have a Significant Adverse Coastal Effect is Not Supported by the Record.**

Commerce acknowledges in its Decision that data reviews prepared by AES and others demonstrate the presence of "persistent levels of chlordane throughout Baltimore Harbor, as well as hotspots of other contaminants, including polychlorinated biphenyls, polyaromatic hydrocarbons, and metals, such as zinc, chromium, nickel, mercury, and copper."  (A.R. 5732.)  It acknowledges further that "for the period of time that sediments are suspended, contaminants could leach into the water column" (A.R. 5733), and that, as a result, "[d]redging may have adverse effects on water quality in the Project area due to the re-suspension of contaminated sediments."  (A.R. 5732.)  It concluded, however, that adverse impacts on water quality from the re-suspension of contaminated sediments during dredging "will be temporary, limited in scope, and mitigated with environmentally sensitive dredging techniques" and, as a result, the "adverse coastal effects" of the Project "will not be significant."  (A.R. 5734.)  Each one of these conclusions is belied by the record.

First, the record demonstrates that the adverse effects of dredging will not be temporary by any meaningful definition of the term.  The initial dredging will take place over a two-year period during which 3.7 million cubic yards of sediment will be removed from the water.  After that, AES proposes to maintenance-dredge another 500,000 cubic yards of sediment every six years to keep the channel and turning basin operational (A.R. 4655, 4686) – a fact that Commerce fails to even mention in evaluating the impacts of sediment re-suspension.[4]  While it is, of course, true that the dredging will stop for

_____

[4]   Ironically, the only mention the Commerce Decision makes of the need for periodic maintenance dredging comes in its explanation of why it believes the benthic community will "rapidly recolonize" the area to be dredged (A.R. 5744) – a conclusion rebutted above.

21

periods of time, to characterize the near-constant disturbance and re-disturbance of the submerged bottom as a "temporary" impact is not supported by the record.

The record also belies Commerce's conclusion that the use of "environmentally sensitive dredging techniques" and the overlap with previously dredged areas means that the impact of re-suspended sediments would be "limited in scope." (A.R. 5734.) Commerce bases its conclusion on two "environmentally sensitive dredging techniques," namely, "the use of a closed ('environmental') clamshell bucket dredge and silt curtains to lessen sediment suspension during dredging." (A.R. 5733.) While it is true that AES has indicated its willingness to use an environmental bucket – which can reduce sediment re-suspension by 30-70 percent (A.R. 418-19, 5118) – it has stated that it will do so only for the "upper surface layers" of sediment. A.R. 4684; *see also* A.R. 418 ("overlying sediment layer"). AES proposes to dredge the majority of the sediments with a non-environmental bucket.

Commerce's reliance on the use of silt curtains is even more problematic when the record is clear that AES does *not* plan to use silt curtains to limit the effects of re-suspended sediments during dredging. AES does plan to use silt curtains, but only in connection with its plans to drive sheet metal into the sediments to support the edges of the terminal facility (A.R. 414, 1557), not in connection with the dredging. (A.R. 1557.)

Even Commerce's use of the fact that the area AES plans to dredge has already been dredged in the past is overstated in its Decision. Commerce states that "[i]n late 2006 BWI Sparrows Point, LLC (BWI) performed dredging of approximately 2.6 million cubic yards of sediment" from the area AES now proposes to dredge (A.R. 5734), and that, as a result, "the channel and turning basin are currently dredged to a depth of 39 feet." (A.R. 5732.) Not so. While BWI was *authorized* to dredge 2.6 million cubic yards of sediment conditional upon identifying an environmentally acceptable disposal site (A.R. 5414, 5444, 5448), it carried out only 600,000 cubic yards of dredging – the amount BWI had

permission to dispose of at Hart-Miller Island containment facility. (A.R. 1557, 3384-85, 5426, 5414, 5614.) As a result, the majority of the area in which AES proposes to dredge is not 39 feet deep, but generally ranges in depth from 15 to 30 feet. (A.R. 206, 416, 4720.) [5]

In the end, Commerce's conclusion that, given the use of "environmentally sensitive dredging techniques," and "[g]iven the overlap in dredging area for the BWI project and the Project, it *seems likely* that Maryland's water quality standards also would not be violated by the Project" (A.R. 5734) (emphasis added), fails to pass muster under the APA. Aside from the fact, discussed above, that it is not supported by substantial evidence in the record, Commerce's conclusion that it "seems likely" that Maryland water quality standards would not be violated is precisely the type of speculation that the district court found wanting in *Connecticut v. U.S. Dept. of Commerce,* 2007 WL 2349894, *12. It is particularly troubling when we now know that, as the Fourth Circuit has held, the Project *does* violate Maryland water quality standards.

**B.   Commerce's Conclusion that the Use of the PDM in Road Construction, Mine Reclamation, and Other Manners "Should Not" Have a Significant Coastal Effect is Arbitrary and Capricious When AES Has Not Identified Specific End Uses for the PDM or Provided Any Data Concerning the Leachability of the PDM.**

Nor does the record support Commerce's conclusion that the dredged material, once removed from the harbor and processed in AES's proposed dredged material recycling facility, "should not" have significant adverse coastal effects. (A.R. 5738.) Commerce concedes, as it must, that "[a]dverse coastal

---

[5]   That MDE previously issued a water quality certification for the BWI project does not mean, as Commerce suggests, that the AES Project would not violate water quality standards. (A.R. 5734.) As the Fourth Circuit held in *AES v. Wilson,* this "argument ignores the importance of the Baltimore Harbor Total Maximum Daily Loads Report . . . issued by Maryland in December 2006" and approved by EPA on December 17, 2007. 2009 WL 4981233, *22. That report – known as the TMDL for Baltimore Harbor – recognized the "overall objective to increase areas in Baltimore Harbor that will meet dissolved oxygen standards. By increasing the areas that will not meet dissolved oxygen standards, AES's proposal to dredge new channels to forty-five feet of depth run contrary to the objective and intent of the Baltimore Harbor TMDL Report – a consideration that was not a factor prior to Maryland's grant of [BWI's] request for a § 401(a)(1) water quality certification." *Id.* at *22-23.

effects may result" from the disposal of 4.5 million cubic yards of processed contaminated sediments (A.R. 5735), but concludes that "AES has identified reasonable means of treating and disposing of dredged material." (A.R. 5738.) The record, however, demonstrates that AES had not at the time of the Commerce Decision – and has not yet even today – provided information as to how the PDM will be beneficially used in the long term or data concerning the potential for the PDM to leach contaminants during that long-term use. (A.R. 5638.)

As described above, AES proposes to mix the dredged contaminated sediments with Portland cement and other admixtures in an effort to bind the contaminants within the resulting PDM. (A.R. 5736.) AES acknowledges that the proposed dredged material recycling process does not remove contaminants from the dredged material, but believes that its process will eliminate the capacity of those contaminants to leach out over time. (A.R. 4644.) AES's belief is not entirely baseless; there is some evidence in the record that this type of treatment may prevent "significant levels [of contaminants] from leaching into aquifers and water bodies or otherwise becoming biologically available." (A.R. 4677.) But the record contains little assurance that the specific binding process AES proposes will be successful in preventing leaching of the contaminants within the Baltimore Harbor sediments, either at first or over time.

MDE repeatedly expressed its concerns about the leachability of the PDM. *See, e.g.,* A.R. 4963. In response, AES has provided data generated from "elutriate" testing – a method of determining the amount of chemical constituents that are released to the water column when the sediments are mixed with water. (A.R. 398.) But such desktop laboratory tests provide information about the leachability while the material is pulled up through the water column during dredging (A.R. 4722), not about the long-term fate of the "bound" contaminants once the PDM is placed in abandoned mines or any of the

other "beneficial uses" AES contemplates.  On that point, AES has declined to provide data on the grounds that it cannot test the PDM because it has not generated it. (A.R. 5638.)

In the place of hard data, AES offers the conjecture that there have been no problems with leachate formation in projects employing PDM dredged from the New York/New Jersey Harbor, which is also contaminated by past industrial use. (A.R. 5639.)  Despite requests, however, AES has not provided any hard evidence that any leachate monitoring has been carried out at any of these projects. (A.R. 5639.)  Nor does the absence of a problem now give assurance that leaching will not occur in the future.  Leaching of contaminants into the surrounding ground water can take years to occur and years more to detect; that no one has reported any "problems" with respect to the material dredged from other projects in the years since its application is not evidence that it will not occur.

In the end, the only support in the record for Commerce's conclusion that mixing the contaminated sediments with Portland cement will "eliminat[e] leachability at levels that would exceed applicable regulatory criteria" (A.R. 5737) is AES's commitment to test the PDM during the treatment process and tailor the addition of Portland cement and other admixtures to ensure compliance with applicable standards. (A.R. 191, 4673.)  It is not enough, however, to satisfy regulatory requirements by simply stating that you *will* satisfy them; "reassurances for the future carry very little value." *Middle Rio Grande Conservancy Dist. v. Babbitt*, 206 F. Supp. 2d 1156, 1191 (D.N.Mex. 2000).  The demonstration that no adverse effects will occur has to be made *before* regulatory authorization is obtained, not after. Until then, the agency simply does not know what it is authorizing.

Finally, it is impossible to reach any defensible conclusion about the adverse coastal effects of the "beneficial" use of the PDM without knowing the specific environmental context of those uses. (A.R. 421.)  While all such uses involve potential impacts to ground water through the leaching of contaminants, the potential impacts associated with the use of the PDM in mine reclamation –

particularly a mine that intercepts ground water – will differ from those associated with its use as road bed material. Similarly, the impacts of using the PDM as landfill capping material may differ widely depending on whether the landfill has a liner and a leachate collection and treatment system. Without an identification of what the specific end uses of the PDM will be, Commerce cannot defensibly conclude that the Project's benefits outweigh its adverse coastal effects. As Commerce puts it, "[i]f the record lacks sufficient information as to the Project's adverse coastal effects, the balancing required to support a finding for AES on Element 2 cannot occur and the state's objection must be sustained." (A.R. 5727.)[6]

C.    **Commerce's Conclusion that the Adverse Coastal Effects of the Proposed Pipeline Crossings of Deer Creek and 171 Other Waterways Would Be Outweighed by the Project's Benefits is Arbitrary and Capricious When the Final Pipeline Route Was Not Known at the Time of the Decision and When the Comments of Commerce's Own Sub-Agency Contradict that Conclusion.**

As with the Project's impacts on water quality from the proposed dredging of Baltimore Harbor, Commerce's conclusions about the coastal effects of construction of the proposed pipeline are not supported by substantial evidence in the record. Forty-eight miles of the 88-mile pipeline will run through Maryland, cutting through and under 171 streams and more than 19 acres of wetlands. (A.R. 5738.) Commerce concedes that "permanent and temporary adverse coastal effects to wetlands and waterbodies will result from pipeline crossings," that "[i]n-stream and shoreline vegetation that provide cover to fish and other aquatic life may be altered or lost at crossing locations," and that "[f]ish may also be temporarily displaced." *Id.* Nevertheless, Commerce concludes that these adverse coastal effects will be "minimized and mitigated such that they will not be significant." (A.R. 5741.)

Commerce's conclusion that the adverse coastal effects of running the proposed pipeline through 171 streams and almost twenty acres of wetlands "will not be significant" is not supported by the record

---

[6]    Maryland is not alone with its concern about AES's inability to identify the end uses of the PDM or the material's acceptability for such uses. The Corps and EPA have both requested similar information from AES. *See* A.R. 4568, 4786, 5404.

when, at the time of its decision, Commerce still did not know the pipeline's alignment. Commerce concedes that "the final pipeline alignment ha[d] not been finalized" as of June 2008, Commerce Answer ¶39, and that only 81% of the pipeline route had been field-surveyed. (A.R. 5739.) Based on desktop mapping programs, Commerce believes that the remaining 16.57 miles of unsurveyed alignment will run though five more wetlands and impact "approximately 1 acre," but "[n]o other information is available for these wetlands." (A.R. 568.) It does not address this issue in its Decision, however, seeming to conclude simply that, wherever the pipeline will run, "the adverse effects on wetlands and waterbodies from pipeline crossings will be minimized and mitigated such that they will not be significant." (A.R. 5741.)

Minimization and mitigation of unavoidable adverse impacts is, of course, the objective of many environmental programs, including those applicable within Maryland. *See, e.g.,* Md. Code Ann., Envir. § 5-909(a) (requiring that all impacts to nontidal wetlands be minimized and mitigated). But minimization techniques are many and varied. For example, two of the minimization techniques Commerce cites for the proposed stream crossings are "dry ditch" construction (*i.e.*, diversion of stream flow around the disturbed area during construction) and horizontal directional drilling or "HDD" (*i.e.*, drilling borehole underneath the stream and pulling the pipeline through it). (A.R. 5739 n.164, 1433-36.) Both reduce the impacts that would occur from construction "in the wet," but the two result in very different adverse coastal impacts.

Open-cut trenching – even if carried out "in-the-dry" – has the potential for significant adverse impacts on water quality. AES proposes to excavate a trench more than five feet deep in order to accommodate the thirty-inch diameter pipeline. (A.R. 200-02.) While characterizing the impacts of trenching as "minor" and "short-term," AES acknowledges that trenching the waterway crossings would result in an "increase in turbidity levels and downstream sediment deposition. Sedimentation and

turbidity may occur as a result of in-stream construction, trench dewatering, and soil erosion along the [construction right-of-way]." (A.R. 412.) "In slack or slowly moving waters, increases in suspended sediment may increase the biochemical oxygen demand and reduce levels of dissolved oxygen in localized areas during construction. Motile organisms may avoid these areas, but sessile and some planktonic organisms may be adversely affected." *Id.*

The use of HDD, by contrast, "does not disturb surface features (vegetation, stream banks, etc.) during or after construction" and, as a result, is the "method most likely to have no impact on water quality." (A.R. 390.) Because it would provide the "maximum protection to water bodies" (A.R. 388), the State and federal resource agencies recommend the use of HDD for the Deer Creek and Gunpowder Falls crossings. *See* A.R. 1536, 1806; *Wilson*, 2009 WL 4981233, *24-25. Indeed, as the Fourth Circuit found in *Wilson*, NOAA has "asserted that an 'open-cut' crossing at Deer Creek was 'not-acceptable' due to impacts on spawning habitat" and has insisted that "a horizontal directional drilling (HDD) crossing and not an 'open cut' crossing must be utilized to protect the sensitive Deer Creek watershed." *Id.* at *25.

As Commerce points out, the National Marine Fisheries Service ("NMFS") – another arm of Commerce – urged AES to pursue HDD at a number of crossings, including the Back and Susquehanna Rivers, Gunpowder Falls, and Deer Creek. *See* A.R. 5740; *see also* A.R. 1431, 1536, 1828-29, 5649. By the time Commerce rendered its Decision, AES had agreed to use HDD to cross the Back and Susquehanna Rivers (A.R. 1439-43), but had declined to do so for Gunpowder Falls and Deer Creek; as Commerce put it, "[c]onsultation with NMFS on the appropriate crossing methods for Gunpowder Falls, Deer Creek, the Octoraro River [in Pennsylvania], and White Marsh is ongoing." (A.R. 5740.) Until the outcome of that consultation is known, Commerce is simply not in a position to conclude that the

impacts of crossing these streams will be minimized or, more importantly, what the adverse coastal effects of the pipeline construction will be.

In the absence of agency review, Commerce appears to rely principally on the fact that "*AES* concludes that impacts from pipeline construction (e.g., increases in in-stream turbidity and downstream sediment deposition) would be minor and short-term." (A.R. 5741, emphasis added.) But, as pointed out in *AES v. Wilson*, the federal resource agencies share MDE's concerns about impacts to these waters, in particular Deer Creek – a State Scenic and Wild River and Tier II water. In addition to NMFS, NOAA "consistently supported" Maryland's concerns about the water quality impacts of crossing Deer Creek by open-cut trenching instead of HDD. *Wilson*, 2009 WL 4981233, *25. The Corps, too, echoed Maryland's concerns, ultimately suspending its review because of, among other things, the "lack of 'final drawings' of proposed stream crossings." *Id.* Without the final pipeline alignment, without the final word on how AES will cross the 171 or more streams and wetlands in its path, and with NMFS, NOAA, and the Corps all on record in opposition to AES's continued insistence on crossing sensitive waterways via open-cut trenching, the record simply does not support Commerce's conclusion.

In fact, the Fourth Circuit has already concluded that the construction of the proposed pipeline would violate Maryland water quality standards and for many of the same reasons discussed above. *See AES v. Wilson*, 2009 WL 4981233, *24-25 (Davis, J. concurring). It is hard to envision how a project's benefits could outweigh its adverse coastal effects when just one subset of those adverse effects – impacts that violate water quality standards – is sufficient under federal law to *prohibit* the issuance of any federal permits associated with the Project. *See* 33 U.S.C. § 1341(a).

**D.** **Commerce's Conclusion that Impacts to Endangered Species Will Not be Significant is Arbitrary and Capricious When the Federal Agencies With Jurisdiction Over Endangered Species Have Not Completed Their Reviews and AES Had Not Even Completed its Species Surveys.**

In addition to impacts from dredging, disposal of the PDM, and the pipeline crossings, the Project would also adversely affect a number of endangered species in Maryland and Pennsylvania. NMFS identified several such endangered species (A.R. 277-79), focusing on the shortnose sturgeon and sea turtles and the fact that the dredging required by the Project may result in a "take" of these species, a term which under the Endangered Species Act means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). NMFS also noted that "[i]mpacts to listed species from other aspects of the project may also be likely." (A.R. 5741.) The U.S. Fish & Wildlife Service added that "portions of the pipeline are within the known range of the listed bog turtle." (A.R. 5742.)

Commerce concedes that, at the time it rendered its Decision, the "consultations" under the Endangered Species Act necessary to ascertain the Project's impacts on listed species were not yet complete. (A.R. 5743.) In fact, the Fourth Circuit in *AES v. Wilson* noted that the "Project's impact on endangered species" remained "outstanding" as of February 2009, with the Corps concluding that "based on information currently in the administrative record, it would be difficult for the project to receive a favorable determination from the Corps . . .." *Wilson*, 2009 WL 4981233, *7. Despite the fact that AES had not yet completed anything but the preliminary habitat surveys necessary to ascertain the Project's impact on endangered species, and that the federal agencies with regulatory authority under the Endangered Species Act (*i.e.*, NMFS and the Fish & Wildlife Service) had not yet determined the extent of the Project's impact, Commerce concludes that "there is no evidence in the record that [the adverse coastal effects] will be significant." (A.R. 5743.)

The only thing in the record that Commerce cites for the proposition that the Project's impact on endangered species will *not* be significant, however, is the fact that "AES concludes that impacts to threatened and endangered species are not likely to be significant." (A.R. 5742.) Of course, AES's own conclusions cannot carry the day; the "dialogue" that the APA contemplates "cannot be a sham." *Natural Res. Def. Council, Inc.,* 547 F.2d at 646. But that is essentially what Commerce does when it leaves the issue of endangered species for other agencies and another day. Citing the provisions of the Endangered Species Act, Commerce simply states that NMFS and the FWS will undertake the necessary "consultation," will make the determination of how the Project will "jeopardize" endangered species, and will provide "reasonable and prudent alternatives to avoid jeopardy." (A.R. 5742-43.) This may turn out to be true; we still do not know. But the Endangered Species Act requires that federal agencies "utilize their authorities in furtherance" of *its* purposes, 16 U.S.C. § 1536(a)(1), and by taking such action necessary "to insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2); *see also* A.R. 279. It is not enough, then, for Commerce to say that *other* agencies will take care of the issue.

More generally, the fact that a project must comply with other laws does not excuse Commerce from collecting the data necessary to determine the Project's adverse coastal effects. "The proper exercise of discretionary authority necessarily requires that the decision be based upon adequate information. To act without the collection of the necessary facts is to abuse discretion." *Xytex Corp. v. U.E. Schliemann,* 382 F. Supp. 50, 53 (D.Colo. 1974).

II.     **Commerce's Reliance on an Incomplete Record to Determine that the Adverse Coastal Effects of the Project Would Be Outweighed by its Benefits is Arbitrary and Capricious and Violates the Terms and Intent of the CZMA.**

Commerce concedes in its Decision that "[i]f the record lacks sufficient information as to the Project's adverse coastal effects, the balancing required to support a finding for AES on Element 2 cannot occur and the state's objection must be sustained." (A.R. 5727.)  Previous Commerce decisions make clear that sufficiency of the record is tied to the "stage of the overall project, with less site-specific information needed for leasing decisions, more site specific information needed for exploration decisions, and still more information needed for a decision to develop and produce hydrocarbon resources." *Decision and Findings in the Drilling Discharge Consistency Appeal of Mobil Oil Exploration and Producing Southeast, Inc.*, at 9 (Sept. 2, 1994) (attached hereto as Exhibit 1).  Because the AES Project involves the final construction and operation of a terminal and pipeline and not just leasing or exploration, it must require the greatest level of site-specific detail.

The record on which Commerce rendered its Decision, however, is incomplete because it closed prior to the identification of basic information about the Project and its impacts.  As discussed above, at the time it rendered its Decision, Commerce did not know, among other things:

- The end-uses and leachability of the PDM;

- The final pipeline alignment;

- The crossing methodologies AES would employ to cross many of the streams and wetlands that lay in the path of the proposed pipeline; and

- The Project's impacts on endangered species.

Indeed, the Fourth Circuit's decision in *Wilson* confirms that, even in February 2009 – *i.e.*, almost a year *after* the record in this proceeding closed – information "about the ultimate disposal of the PDM, the final pipeline alignment and crossing methodologies, and the Project's impact on endangered species" was still unknown. *Wilson*, 2009 WL 4981233, *7.  With critical information outstanding about the

Project's impacts on water quality, aquatic habitat, and endangered species, the record lacks "sufficient information" for anything but the types of guesses Commerce ventures in its Decision. *See, e.g.,* A.R. 5734 (surmising that "it seems likely that Maryland's water quality standards also would not be violated by the Project"), 5744 (speculating that full recovery of benthic community "could occur within months" of dredging). This falls well short of what the APA and the CZMA require. *Connecticut*, 2007 WL 2349894, *12.

Commerce defends its reliance on an incomplete record on three grounds: (1) that "information that is insufficient for purpose of [other federal environmental] requirements may still be sufficient for purposes of a CZMA analysis" (A.R. 5728-29); (2) that other agencies will complete the "required analyses" prior to construction of the Project, *id.*; and (3) that "newly established" statutory deadlines require it to close the record prior to the completion of "environmental reviews," with the "quite possible" result that Commerce will have to make an override decision based on a limited record (A.R. 5728). None of these arguments makes up for the fact that Commerce's Decision is not supported by substantial evidence.

A.   **Commerce Violates the APA By Basing its Override Decision on a Record That Lacks Substantial Evidence Demonstrating that the Project Will Not Violate Water Quality Standards, the Endangered Species Act, and Other Federal Statutory Mandates.**

Commerce concedes that its responsibility is to determine the Project's coastal effects but maintains that the type of information it needs to render an override decision is not the same, not as detailed, as that required by other agencies to complete their permit reviews; "[b]ecause an appeal determination under the CZMA is but one step in the process for authorizing the Project, and in this case one of the earliest steps, the CZMA does not require that the decision record contain all information resulting from these review processes, but rather that it contain sufficient information to identify the Project's adverse coastal effects for purposes of the balancing required by Element 2." (A.R. 5729.)

It may well be true that the universe of information Commerce needs in order to carry out the Element 2 balancing analysis under the CZMA may not be identical to that required by other federal resource agencies to carry out their permit reviews; those agencies may well impose purely administrative preconditions to permit issuance that do not bear on the substance of their environmental reviews. It is certainly not true, however, that a Project that "jeopardizes" endangered species, violates water quality standards, and fails to minimize environmental impacts over the objections of those federal agencies is in any way "consistent with the objectives of [the CZMA]." 16 U.S.C. § 1456(c)(3)(A).

"Although sensitive to balancing competing interests, [the CZMA] was first and foremost a statute directed to and solicitous of environmental concerns." *Connecticut*, 2007 WL 2349894, *5 (quoting Kalo, *Coastal and Ocean Law* 3d, at 200). Congress enacted the CZMA in 1972 to provide funding for the development and implementation of state CMPs, finding that:

> [t]he key to more effective protection and use of the land and water resources of the coastal zone is to encourage the states to exercise their full authority over the lands and waters in the coastal zone by assisting the states, in cooperation with Federal and local governments and other vitally affected interests, in developing land and water use programs for the coastal zone, including unified policies, criteria, standards, methods, and processes for dealing with land and water use decisions of more than local significance.

16 U.S.C. § 1451(i). The CZMA states that "it is the national policy (1) to preserve, protect, develop, and where possible, to restore or enhance the resources of the Nation's coastal zone for this and succeeding generations; [and] (2) to encourage and assist the states to exercise effectively their responsibilities in the coastal zone through the development and implementation of management programs to achieve wise use of the land and water resources of the coastal zone, giving *full consideration* to ecological, cultural, historic, and esthetic values as well as the needs for compatible economic development. . . ." 16 U.S.C. § 1452 (emphasis added).

At the time Commerce rendered its Decision, critical reviews concerning the Project's compliance with water quality standards, the Endangered Species Act, and § 404 of the Clean Water Act were outstanding. This is not the "full consideration" the CZMA requires. And now the Fourth Circuit has concluded that the Project in fact does violate water quality standards on two independent grounds. Without this critical information before it, Commerce could not legitimately perform the "balancing required to support a finding for AES on Element 2" and, as a result, Maryland's "objection must be sustained." (A.R. 5727.)

**B.      Commerce Violates the CZMA By Leaving to Other Agencies its Responsibility to Ascertain the Adverse Coastal Effects of the Project and By Failing to Provide State and Federal Agencies a "Reasonable Opportunity for Detailed Comments."**

Commerce dismisses the fact that these critical issues were outstanding at the time it rendered its Decision with the assurance that "all of the required analyses, consultations, and permit decisions must still be completed prior to actual commencement of a project." (A.R. 5729.) That other agencies have regulatory jurisdiction over certain aspects of the Project does not, of course, excuse Commerce from its obligations under both the CZMA and the APA. Neither statute provides authority for Commerce to delegate to other federal agencies its responsibility to evaluate whether "the national interest furthered by the activity outweighs the activity's adverse coastal effects." 15 C.F.R. § 930.121(b).

In fact, the CZMA provides precisely to the contrary, requiring that Commerce coordinate other federal agency reviews with the CZMA process. Section 307(a) provides that, in carrying out his duties under the Act, the Secretary of Commerce "shall consult with, cooperate with, and, to the maximum extent practicable, coordinate his activities with other interested Federal agencies." 16 U.S.C. § 1456(a). The statutorily required coordination must take place throughout the CZMA process, beginning with the submission of the states' CMPs, *see* 16 U.S.C. § 1456(b) (prohibiting Commerce from approving a state CMP "unless the views of Federal agencies principally affected by such program have been adequately

considered"), and extending through the consistency override process.   Specifically, § 307(c)(3)(A)

requires that Commerce, before overriding a state's objection, must provide "a reasonable opportunity

for detailed comments from the Federal agency involved and from the state, that the activity is

consistent with the objectives of [the CZMA] or is otherwise necessary in the interest of national

security." 16 U.S.C. § 1456(c)(3)(A).

In this case, Commerce did offer federal agencies the opportunity to comment, *see generally*

A.R. 4597-4616, but placed restrictions on the timing of the opportunity that fall short of the "reasonable

opportunity for detailed comments" the statute requires.  As a result, each and every federal resource

agency that responded to Commerce's request for comments within the four-week timeframe allowed

made clear that it was far too early in the review process to provide comments on the Project:

- EPA "anticipates reviewing a draft EIS and CWA Section 404 permit application for the AES Sparrows Point LNG Project in the future, but has not yet done so, and is therefore not in a position to provide comment on the project at this time" (A.R. 5677);

- The Corps stated that "[t]he EIS should comprehensively evaluate the environmental [e]ffects of the proposal, including those issues raised in your letter" and that it would "comment on the adequacy of the EIS once it is released" (A.R. 5691); and

- FERC stated that, while it would be "conducting an extensive analysis of the project" that "will examine the need for the project, and include an exhaustive study of the project's environmental impacts, alternatives, and safety and security," it was still "in the early stages of collecting information on the project" and therefore was "not in a position to comment on the issues raised by your letter." (A.R. 4849.)

In its Decision, however, Commerce mischaracterizes these and other responses by stating simply that

they provided "no negative comments" -- a mantra that Commerce repeats at the close of its analysis on

each and every subject.  *See* A.R. 5734 ("no negative comments" on re-suspension of sediments), 5738

("no negative comments" on disposal of PDM), 5741 ("no negative comments" on pipeline impacts),

5743 ("no negative comments" on endangered species), 5745 ("no negative comments" on fish and

aquatic vegetation), 5746 ("no negative comments" on impacts to Chesapeake Bay), 5748 ("no negative

comments" on effects of vessel traffic), 5750 ("no negative comments" on cumulative coastal effects). Its mischaracterization of these responses is especially troubling when NOAA "particularly" sought comments from these agencies on the "sufficiency of the existing record to identify and weigh the adverse coastal effects of the Project." (A.R. 5681, 5683, 5687.)

This is not harmless error; we know from the *Wilson* decision that the federal resource agencies shared Maryland's concerns about the Project's impact on both Baltimore Harbor dissolved oxygen levels, *Wilson*, 2009 WL 4981233, *22, and fish habitat within Deer Creek, *id.* at *25. We also know that at least one of the federal agencies informed AES that it was prepared to *deny* its application under the federal Clean Water Act because of these same concerns. *See Wilson*, 2009 WL 4981233, *7-8 (finding that Corps had informed AES "that based on information currently in the administrative record, it would be difficult for the project to receive a favorable determination"). Commerce's repeated statement that the federal agencies had "no negative comments" is just one of a "combination of danger signals[ ] that the agency really has not taken a 'hard look' at the salient problems, and has not genuinely engaged in reasoned decision-making." *Rutherford v. U.S.*, 438 F.Supp. 1287, 1290 (W.D.Okla. 1977).

The practical effect of basing its decision on a record closed before all State and federal agencies had had a "reasonable opportunity for detailed comments" is that Commerce rendered its decision based almost entirely on information submitted by AES, which itself fails to pass scrutiny under the APA. *See* A.R. 5730 (stating that the "majority" of the record is comprised of "Resource Reports that AES submitted during FERC's pre-filing environmental review process"). "Where only one side of a controversial issue is developed in any detail, the agency may abuse its discretion by deciding the issues on an inadequate record. A reviewing court must assure itself not only that a diversity of informed opinion was heard, but that it was genuinely considered." *Natural Res. Def. Council, Inc. v. U.S.*

*Nuclear Reg. Com'n,* 547 F.2d 633, 646 (D.C. Cir. 1976).  The "dialogue" that the APA contemplates "cannot be a sham."  *Id.*

### C.   The Commerce Decision Deprives the State of its Primary Responsibility for Reviewing Projects in the Coastal Zone.

"The CZMA's legislative history makes clear that Congress intended ultimate responsibility for the regulation of land use in the coastal zones to remain with the states." *Shanty Town,* 843 F.2d at 793. As the Fourth Circuit has recognized, "this deliberate Congressional decision," *id.,* is described in the Senate Report accompanying the initial passage of the Act in 1972:  "The Committee has adopted the States as the focal point for developing comprehensive plans and implementing management programs for the coastal zone." S. Rep. No. 92-753, 92d Cong. 2d Sess. (1972), U.S. Code Cong. & Admin. News 1972, pp. 4776, 4780, *reprinted in Legislative History of the Coastal Zone Management Act of 1972, As Amended In 1974 and 1976 With a Section-By-Section Index,* Prepared at the Request of Hon. Warren G. Magnuson, Chairman, Committee On Commerce And Hon. Ernest F. Hollings, Chairman, National Ocean Policy Study, For the Use of the Committee On Commerce And National Ocean Policy Study, Pursuant To S. Res. 222. Available at http://www.archive.org/stream/legislativehisto76unit#page/n1/mode/2up (last visited January 8, 2010) ("Legislative History"); *see also id.* at 4795 (reiterating that "[t]hroughout this act, the State has been the major focal point for planning and managing the coastal zone of the United States") (available at *Legislative History* at 212).

Subsequent re-authorizations of the CZMA continued to emphasize the states' authority, retaining or expanding federal consistency requirements against energy-related pressures at each juncture.  In 1976, in the midst of the energy crisis, Congress amended the CZMA to "help the States deal with problems resulting from increased energy-related activities in the coastal zone." *Norfolk Southern v. Oberly,* 632 F. Supp. 1225, 1245 (D.Del. 1986) *aff'd in part on other grounds at* 822 F.2d 388 (3rd Cir. 1987). While the 1976 Amendments added a requirement that "the States take into account

38

the siting of energy facilities in assessing the 'national interest,'" *id.*, they did not require the "affirmative accommodation" of such facilities, *American Petroleum Inst. v. Knecht*, 456 F. Supp. 889, 924 (C.D.Cal. 1978), and otherwise "left intact the existing framework of the original Act." *Norfolk Southern*, 632 F. Supp. at 1245. In fact, the House Committee on Merchant Marine and Fisheries made clear that it "in no way wishes to accelerate the location of energy facilities in the coasts; on the contrary, it feels a disproportionate share are there now. . . . There is no intent here whatever to involve the Secretary of Commerce in specific siting decisions." *Legislative History* at 931-32 (H. Rep. No. 94-878); *API*, 456 F. Supp. at 924.

The 1990 CZMA amendments continued and expanded the statute's focus on state authority and resource protection. The impetus for the 1990 amendments was the Supreme Court's decision in *Secretary of the Interior v. California*, 464 U.S. 312 (1984), which held that outer continental shelf oil leasing decisions were not subject to the states' federal consistency powers. The amendments expressly overruled the Court's decision and thereby "furthered Congress' efforts to 'enhance state authority by encouraging and assisting the states to assume planning and regulatory power over their coastal zone' by widening the array of federal activities subject to consistency review." *Amber Resources Co. v. U.S.*, 68 Fed. Cl. 535, 557 (Fed.Cl. 2005).

The regulations that govern the states' role within the CZMA consistency process recognize that Maryland properly carried out its responsibilities in denying federal consistency for the Project. The preamble to the Department of Commerce's "Coastal Zone Management Act Federal Consistency Regulations of 2006" makes crystal clear that MDE is well within its rights to deny federal consistency on the grounds that AES has not obtained its CMP-networked permits:

> Removing State permits from necessary data and information only affects starting the six-month review period. This change does not affect the States' ability to require that a State permit (which contains State

39

> enforceable policies) be issued in order to find a project consistent or
> object to an activity because the applicant did not obtain the State permit
> within the six-month period.  This does not result in "pre-judging" the
> State permit if the permit is not acted upon within the six-month CZMA
> review.  States may object to the consistency certification while providing
> that the objection will become a concurrence if the State permit is issued.

71 Fed. Reg. 788, 813 (Jan. 5, 2006).  Indeed, Commerce has already conceded that "Maryland properly

objected," both on the basis of "inconsistency with Maryland's Program" (A.R. 5716), and on the basis

that it "lacked sufficient information to determine consistency with Maryland's Program." (A.R. 5717.)

By overriding Maryland's "proper" objection on the basis of a record that was closed during

"one of the earliest steps" within the regulatory review of the Project (A.R. 5729), and years from

adequately describing the impacts of the project, Commerce effectively writes the State out of the

statute.  Under Commerce's reading of its statutory and regulatory obligations, it would be difficult, if

not impossible, for any state with a networked program to defend its objection when the override

process is over well before the record is complete.  As the facts of this case show, it takes years for a

project of this magnitude to be adequately surveyed, documented, and reviewed by the regulatory

agencies with substantive authority over the project.

In the end, Commerce justifies its rejection of State's position on the same grounds it justifies

rendering its decision on an incomplete record, namely, that AES still must obtain all State and federal

environmental permits once those reviews run their course:

> This decision to override Maryland's objection does not supplant other
> state and Federal license and permit requirements and review processes,
> including environmental license and permit requirements and review
> processes. AES still will be required to obtain all necessary state and
> Federal licenses and permits, and all necessary review processes will need
> to be completed. Whether the state and Federal licensing and permitting
> agencies ultimately grant the required authorizations will depend on the
> record evidence then available to them and compliance with applicable
> law for the issuance of such authorizations.

A.R. 5714; *see also* A.R. 5720, 5729, 5731, 5753 (reiterating that Project must still obtain all necessary state and federal permits).  As discussed above, depriving the federal agencies of a meaningful role within the CZMA process is troubling; it violates the terms of the CZMA and results in decisions rendered without a full consideration of environmental concerns.  But for the State, Commerce's abdication of its override responsibilities is doubly troubling.

While the federal agencies will have the later opportunity to make sure that their concerns are addressed prior to issuing their own permits, the CZMA consistency process is the only tool the Natural Gas Act guarantees for the State to regulate the coastal environmental impacts of LNG facilities.  As the Fourth Circuit observed in *AES v. Smith*, § 717b(e)(1) of the Natural Gas Act grants FERC "exclusive authority" over the siting of LNG terminals and "leaves state and local governments with no residual power to site LNG terminals or to take actions that would effectively approve or deny such siting."  527 F.3d at 125.  The only express exceptions to the statute's preemptive reach are the states' roles within the CZMA, the CWA, and the Clean Air Act. *See id.*, at 123; 15 U.S.C. § 717b(d).  If Maryland's denial is overridden, then, it may well have no further say under State or federal law.[7]  It is disingenuous for Commerce to justify its override on the rationale that the states can protect their interest through their own permitting processes when those processes may well be preempted.  For a state to have any say with respect to a project's coastal impacts, the CZMA federal consistency process may well be the only game in town.

It is true, as Commerce points out, that Congress amended the Natural Gas Act in 2005 to expedite the processing and review of energy projects and "established new limitations on the time

---

[7]    While Maryland does have its authority under § 401 of the Clean Water Act, AES continues to argue that Maryland has waived its rights under the CWA and that, therefore, has *no* say whatsoever about the Project and its impacts within Maryland. *See Wilson*, 2009 WL 4981233, *11-15.

available to develop the decision record." (A.R. 5727.) But Congress specifically provided that "nothing in the [NGA] affects the rights of States under" the CZMA, the Clean Water Act, or the Clean Air Act. 15 U.S.C. § 717b(d). Commerce cannot, therefore, justify its approval of the Project on an incomplete record on the grounds that it *had* to close the record when it did. Regardless of the Natural Gas Act timetable, "[t]he proper exercise of discretionary authority necessarily requires that the decision be based upon adequate information. To act without the collection of the necessary facts is to abuse discretion." *Xytex*, 382 F. Supp. at 53. The Commerce Decision cannot stand when it appears from the record that it "started with a clear idea of where it would end up and went directly to that point with little pause or process in between," without the "careful identification or weighing of pertinent facts, any meaningful consideration of the concerns and opinions of state and federal authorities or any regard for the several entities with direct involvement in the issues to be decided." *Middle Rio Grande Conservancy Dist. v. Babbitt*, 206 F. Supp. 2d 1156, 1180 (D.N.Mex. 2000).

In sum, the Secretary of Commerce's Decision, by relying on an incomplete record, and through its numerous deficiencies, errors, and lack of deference to the State's and other federal agencies' opinions and processes, effectively nullifies the statutory requirement that a project be consistent with the State's CMP, renders meaningless the State's lawful objection to an applicant's federal consistency certification based on insufficient information, deprives the State of a federally-provided mechanism for exercising its rights and responsibilities under the CZMA, and abdicates responsibility for the protection of the State's coastal zone to future studies and review processes conducted by other agencies.

## CONCLUSION

For the reasons set forth above, the Court should grant MDE summary judgment, vacate the

Commerce Decision, and remand this case with direction to sustain Maryland's objection.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

ADAM D. SNYDER
Assistant Attorney General
Federal Bar No. 27523
Office of the Attorney General
Maryland Department of the Environment
1800 Washington Boulevard
Baltimore, Maryland  21230
(410) 537-3034
(410) 537-3943 (fax)